## PITTSBURG LIFE & TRUST CO. v. NORTHERN CENT. LIFE INS. CO.

(Circuit Court, W. D. Pennsylvania. October 14, 1905.)

### No. 34.

1. FRAUD—ACTION FOR DECEIT—GROUNDS.

An action for deceit is based on fraud, and to sustain it there must not only have been false representations, but, contrary to the rule in suits for rescission, they must have been made fraudulently and intentionally, or so recklessly and without concern as to their truthfulness as to be the equivalent of actual fraud.

[Ed. Note.—For cases in point, see vol. 23, Cent. Dig. Fraud, §§ 3–5.]

**2. SAME—FACTS CONSIDERED.**

Plaintiff purchased the business and assets of defendant life insurance company, and in the examination into defendant's condition made by plaintiff's representative before the sale a list of policies was used, which was furnished by defendant's officers and had been previously prepared for its own use and information. After the sale it was found that there were errors in said list in stating the character of the policies, and that a larger reserve fund was required than that shown by the computation based thereon, and which, under the terms of the sale, defendant turned over to plaintiff. *Held*, that such facts would not support an action for deceit, to recover as damages the amount of such additional reserve; there being no evidence that the list was furnished with any actual intention to defraud.

[Ed. Note.—For cases in point, see vol. 23, Cent. Dig. Fraud, §§ 3–5.]

**3. SAME—EFFECT OF MISREPRESENTATIONS—EXAMINATION BY PURCHASER.**

Where a prospective purchaser undertakes to make, and does make, an investigation of his own of the property, and the seller does nothing to prevent it from being as full as is desired, the purchaser cannot afterwards be heard to say that the seller made misrepresentations, which he relied upon to his hurt.

[Ed. Note.—For cases in point, see vol. 23, Cent. Dig. Fraud, §§ 17–21; vol. 43, Cent. Dig. Sales, §§ 65, 66, 90.]

**4. SAME—EXPRESSION OF OPINION.**

Defendant life insurance company, among the assets transferred to plaintiff on a sale of its property and business, included its balances of accounts against agents, as shown by its books. A list of such balances was made and shown to plaintiff, and in reply to an inquiry defendant's secretary stated that they had charged off the bad accounts and that those remaining were "better than the ordinary." No representation was made as to the solvency of the persons charged or the collectibility of the accounts. *Held*, that such statement was merely an expression of opinion, and neither that nor the list shown could be made the basis of an action against defendant for deceit because the amount of some of the accounts was disputed or offsets were claimed.

[Ed. Note.—For cases in point, see vol. 23, Cent. Dig. Fraud, §§ 12–14; vol. 43, Cent. Dig. Sales, § 67.]

**5. SAME—ACTION FOR DECEIT—DAMAGES.**

In an action for deceit in making false representations with respect to property sold, the amount recoverable, if the deceit is proved, is not the difference between the price paid and the value of the property if it had been as represented, but the actual loss of plaintiff, which is measured by the difference between the actual value and the price he was induced to pay; and where the sale was a single transaction, although different kinds of property were embraced therein, there can be no recovery, unless it is shown that the property obtained as a whole is worth less than was paid for it.

[Ed Note.—For cases in point, see vol. 23, Cent. Dig. Fraud, §§ 60–65.]

At Law. On rule to show cause why compulsory nonsuit should not be taken off.

Frank Ewing and John S. Ferguson, for plaintiff.
W. S. Dalzell and H. W. Frazer, for defendant.

ARCHBALD, District Judge.[1] This is an action of deceit, based upon alleged misrepresentations made in the course of a sale by the defendants to the plaintiffs of their property and business. A compulsory

[1] Specially assigned.

nonsuit was entered at the trial and the question is whether this was justified. It appears from the evidence, that sometime early in 1903, the plaintiff company, which was then recently organized, being desirous of getting hold of an established business, made inquiry, through Mr. Baldwin, its vice president and general manager, of Mr. M. M. Dawson, who was its consulting actuary, whether he knew of a company which wished to reinsure, promising him a commission if he could secure one. Mr. Dawson was also consulting actuary of the defendant company, which was located at Toledo, Ohio, and suggested that it might possibly be in the market. He stated that he was about to make an examination there, and would ask leave to disclose what he found. Later on, he went to Toledo, and told the officers of the company of the proposal, asking them whether they would be open to negotiations, and receiving permission to make use of the information which he got from his investigation of the company's affairs. The examination which he then proceeded to make was conducted in the usual way, and was completed some time in July. With the consent of the defendants, it was given to Mr. Baldwin, who on the strength of it shortly afterwards notified Mr. Dawson, that if cash or assets were turned over sufficient to equal the full legal reserve required by the state law on outstanding policies, he would pay $15 a thousand for the insurance in force. This offer was laid before the defendants, but was rejected. Subsequently, however, Mr. Baldwin was advised by Mr. Dawson to come to Toledo, which he did, and the amount was there raised to $17 a thousand, the business to be brought down to August 1st; which was also declined. In the conference which followed, the officers of the defendant company frankly stated that they must realize enough to bring the stockholders, who had paid cash for stock, out whole, which they had Mr. Dawson figure for them. And in order to get the price up to what was so required, Mr. Baldwin finally offered to pay $11,000 more if agents' balances, furniture, and other similar assets were turned over; and this was accepted. Mr. Dawson was then directed to bring his estimates down to August 1st, which he did by carrying forward the reserves on policies ending in July, according to a list furnished him by the officers of the defendant company. The result of this and his previous work was then embodied in a formal statement; and at the request of the parties, a writing, expressive of the understanding between them, was drawn up by him, which they duly executed. By it the defendant company agreed to go out of business, and to transfer to and reinsure in the plaintiff company all its policies, which that company undertook on its part to guaranty; and also to assign and deliver certain specified assets, consisting of real estate mortgages, policy loans, lien notes, and due and deferred premiums, amounting to $197,205.15; as well as agents' balances, furniture, fixtures, books, and supplies, without any particular value affixed to them. In consideration of this, the defendants were to receive $104,515.30, made up, as otherwise appears, of $93,515.30, on account of insurance turned over, at the rate of $17 a thousand, and of $11,000 for agents' balances, etc., already spoken of. The insurance reserve on their policies, however, as computed

by Mr. Dawson, was not up to the mark by $52,741.14; and this sum the defendants agreed to pay in cash in addition to the assets parted with, from which they were to be relieved to a partial extent, in case the Ohio insurance commissioner could be persuaded to re-rate certain subordinary policies. The bargain as so agreed upon was subsequently carried out by the parties.

After, however, the plaintiffs had been put in possession of the business, discrepancies began to appear with regard to it. It was found upon the examination of certain policies, that they were not of the character apparently indicated on the list furnished to Mr. Dawson, on which he had based his computation, requiring in consequence a larger reserve than he had calculated on. Some, for instance, which had been rated as 20-year policies, called for a return of part of the premiums in case of death, and a return of the whole at the end of 20 years, should the party live so long; features which are not present in ordinary 20-year policies. Upon others, payment of premiums had been made in advance, and no record of it entered on the balance sheet. While, on still others, there was an extra or excessive guaranty, which practically left no margin for expenses. Upon going over the records of the company thoroughly, particularly the original applications and card registry, it was found that additional reserve would be required, on account of these three classes of policies, to bring them up to the legal standard, amounting to $9,772.73. This the plaintiff company was compelled to make good to the insurance department of Ohio, and now seeks to recover in this action, on the ground, that the list of policies furnished to Mr. Dawson by the officers of the defendant company, which they knew was required to be accurate, was so radically wrong that it amounted to a fraud, for which the company is liable.

Disposing of this branch of the case before proceeding to another, it is to be noted that the plaintiffs are not suing on the agreement, to have the defendants make good the insurance reserve, which it might possibly be claimed, notwithstanding the figures there found, that they were bound for; although they are in reality asking damages, in a way, quite foreign to the action, that would effectively do so. Neither are they seeking to set the agreement aside, on the ground of material misrepresentation; to which relief they might possibly be entitled. They hold to the bargain, but claim that they were overreached and cheated in making it, which must therefore be established in order to entitle them to a verdict. This is the gist of the action, and as a clear apprehension of it is necessary to a correct disposition of the case, let us look at some of the authorities.

"The action for deceit at common law," says Lord Fitzgerald in Derry v. Peek, L. R. 14 App. Cas. 337, "is founded on fraud. It is essential to the action that moral fraud should be established, and since the case of Collins v. Evans, 5 Q. B. 804, 820, in the exchequer chamber, it has never been doubted that fraud must concur with the false statement to maintain the action. It would not be sufficient to show that a false representation had been made. It must further be established that the defendant knew, at the time of making it, that the representa-

tion was untrue, or, to adopt the language of the learned editors of the Leading Cases, that 'the defendant must be shown to have been actually and fraudulently cognizant of the falsehood of his representation, or to have made it fraudulently without belief that it was true.'" In the same case it is said by Lord Herschel:

"I think the authorities establish the following propositions; First, in order to sustain an action of deceit there must be a proof of fraud, and nothing short of that will suffice; secondly, fraud is proved when it is shown that a false representation has been made (1) knowingly or (2) without belief in its truth or (3) recklessly, careless whether it be true or false."

So in Lord v. Goddard, 13 How. 198, 14 L. Ed. 111, it is said by Mr. Justice Catron:

"The gist of the action is fraud in the defendants, and damage to the plaintiff. Fraud means intention to deceive. If there was no such intention; if the party honestly stated his own opinion, believing at the time that he stated the truth, he is not liable in this form of action, although the representation turned out to be entirely untrue."

Similarly it was declared in Union Pacific R. R. v. Barnes, 64 Fed. 80, 12 C. C. A. 48, that an action of deceit "requires for its foundation a false statement knowingly made, or a false statement made in ignorance of, and in reckless disregard of its truth or falsity, and of the consequences such a statement may entail. The evil intent—the intent to deceive—is the basis of the action." And in Hindman v. Bank, 112 Fed. 931, 50 C. C. A. 623, 57 L. R. A. 108, it is said by Judge Lurton:

"Before the plaintiff can recover in an action of deceit he must prove two things: That the representation was false; and that the person making it knew it was false. * * * Such an action differs essentially from one brought for rescission of a contract on the ground of misrepresentation. In the latter kind of suit it is immaterial whether the representation was made dishonestly or not. If the contract was obtained by misrepresentation, however honestly made, it cannot stand. But when the action is for fraud and deceit, it is not enough to show that the representation was untrue, for, if it was honestly believed to be true, that is a good defense."

It is also well said by Judge Hook, in Kimber v. Young (C. C. A.) 137 Fed. 744:

"The basis of the action of deceit is the actual fraud of defendant—his moral delinquency; and therefore his knowledge of the falsity of the representation, or that which in law is the equivalent thereto, must be averred and proved. There is much confusion in the authorities upon this subject, due in part to the erroneous assumption, that that which is merely evidence of fraud is equivalent to the ultimate fact which it tends to prove, and also to the assumption, likewise erroneous, that an untrue representation which would be sufficient to support a suit in equity for a rescission of a contract is equally as available in an action of deceit."

The law as thus laid down is well settled, however it may not be kept in mind in some of the cases; and confusion only arises where it is departed from. The question is whether anything within it is made out here. Clearly not, so far as respects any positive intent to deceive. It is not claimed for instance, that the officers of the defendant company got up a deceptive list of policies for Mr. Dawson to make his computation upon, in order to secure a better bargain than they otherwise could. The list which was used was made out long before the parties

came together, and entirely independent of that fact, for the purpose of having the opinion of Mr. Dawson as consulting actuary with regard to the condition of the company. And the same is true with respect to the computation based upon it, except only as to the extensions for the July business. It is impossible from this to make out anything like intended fraud.

Admitting this to be so, however, the plaintiffs contend, that knowing that reliance was being placed upon the list, the officers of the defendant company were bound to see that it was correct, and are to be judged the same as though they asserted that it was; of which, if they had no actual knowledge, they are convicted of such recklessness as amounts to fraud. It is no doubt true, that a false statement, recklessly made, without knowledge of its truth or falsity, is the equivalent of actual fraud, being the same in effect as if uttered knowingly. Story, Eq. Juris. § 193; Cooper v. Schlesinger, 111 U. S. 148, 4 Sup. Ct. 360, 28 L. Ed. 382; Hindman v. Bank, 112 Fed. 931, 50 C. C. A. 623, 57 L. R. A. 108; Kimber v. Young (C. C. A.) 137 Fed. 744. Care must be taken, however, in enforcing this rule; having regard to the alternative for which it stands. It is not every misstatement that amounts to a cheat and a fraud. These are strong terms, implying moral obliquity, and are not to be lightly applied. To be so characterized, the statement or representation must not only be untrue, but must be made without concern whether it is or not, and consideration must therefore be given to the circumstances under which it is made.

In the present instance, the list, with regard to which reckless misstatement is charged, was one—as already observed—which had been made out by the defendants for use in their business, and was relied upon by them as correct, however now it turns out to be otherwise. There was every incentive to have it represent the policies as they actually were, and if it did not they were self-deceived. How it came to be in the shape it was, or in what way errors had crept in, is not shown. According to the plaintiffs it does not matter, absolute verity being required. But that is not the law. In the shape that it stood, it constituted a part of the records of the company and as such it was submitted with the rest. No one seems to have thought it necessary to verify it, which it admittedly would have taken from one to two weeks to do. That the officers of the company should have suffered it to be relied upon without verification, which is all that can be complained of, cannot be regarded as such heedlessness of consequences as to amount to fraud. The discrepancies might possibly be made the basis for repudiating or being relieved from the bargain, but no blame attaches by reason of them, such as is necessary to make out the present charge.

But the plaintiffs are equally concluded upon another ground. It is established by a beadroll of authorities, to which there is no substantial dissent, that where a prospective purchaser undertakes to make, and does make, an investigation of his own, and the vendor does nothing to prevent it from being as full as is desired, the purchaser cannot be afterwards heard to say that the vendor made misrepresentations, which he relied upon, to his hurt. Slaughter v. Gerson, 13 Wall. 379, 20 L. Ed. 627; Southern Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct.

881, 31 L. Ed. 678; Farrar v. Churchill, 135 U. S. 609, 10 Sup. Ct. 771, 34 L. Ed. 246; Farnsworth v. Duffner, 142 U. S. 43, 12 Sup. Ct. 164, 35 L. Ed. 931; Shappirio v. Goldberg, 192 U. S. 232, 24 Sup. Ct. 259, 48 L. Ed. 419; Atwood v. Small, 6 Clark & Fin. 232; Jennings v. Broughton, 5 Deg. M. & Gord. 126; Haywood v. Cope, 25 Beav. 140; Mahaffey v. Ferguson, 156 Pa. 156, 27 Atl. 21; Tuck v. Downing, 76 Ill. 71; Ludington v. Renick, 7 W. Va. 273; Hall v. Thompson, 1 Smedes & M. 443; Colton v. Stamford, 82 Cal. 351, 23 Pac. 16, 16 Am. St. Rep. 137; Long v. Warren, 68 N. Y. 426; Smith v. Curran (C. C.) 138 Fed. 150.

This rule is applicable here. When Mr. Dawson made his examination of the affairs of the defendant company in July, he had already been commissioned by the plaintiffs to see what he could do towards securing the defendant's business; and it was upon the strength of the information obtained in that connection, which with the defendant's consent he communicated to the plaintiffs, that the parties were brought together, and a sale eventually made. The plaintiffs thus had a representative on the ground, in advance, in the most intimate relation, as consulting actuary, with that with which they expected to deal, and it was no fault of the defendants if the examination which was made was not as complete as it might have been. The list of policies submitted to him was the same as he had acted upon before, but he did not have to stop with it; and it cannot be said that the defendants placed anything in his way. Finally, when the bargain was about to be consummated, they put themselves entirely into his hands, as to the computation of the insurance reserve, as well as other matters; the amount fixed by him being accepted and written into the agreement. Affording in this way as they did the fullest opportunity to get at the true condition of the company, and the plaintiffs, by their representative, having undertaken to investigate it, it does not lie in the mouth of the latter to now complain. Under such circumstances, according to the authorities cited, the misrepresentation which is charged, even if it were established, as it is not, could not have been made the basis of proceedings to rescind; and much less can it of an action of deceit, such as we have here.

The question of agents' balances remains. These stand somewhat differently. As already observed, at the time the parties were negotiating together, in order to close the transaction and enable the defendants to realize the amount needed to make their cash stockholders whole, Mr. Baldwin, for the plaintiffs, agreed to allow $11,000 additional on the strength of agents' balances, furniture, etc. An itemized list was submitted, showing $7,669.50 of the one, and $3,210.67 of the other, making $10,880.17 in all; the other things which went with them not being separately valued. Question being raised as to the reliance to be placed on the agents' balances, it was stated by Captain Slemmons, the secretary, that they had charged off the bad accounts, and that those which remained were better than the ordinary. It is now claimed that there are serious deficiencies in these accounts, of which the officers of the company must have known, and that in listing them as they did, as well as in stating what they did with regard to them, they affirmed

their entire validity, and are chargeable in consequence now that they fall short.

There are six which are so complained of, amounting to $3,877.71, but by no means are all of these discredited. Fairchild, for instance, who is charged on the books with $368.18 admits that he received advances on account of commissions to be earned, and while he thinks that the one was fully offset by the other, he acknowledges that he never kept track of the matter, so that his testimony practically amounts to nothing. Sturdevant also, against whom $844.24 is charged, concedes that he got advances which were subject to adjustment by means of business to be obtained, as to which he had never had a settlement. His statement in the face of this, that he does not owe the company anything, without any particulars to substantiate it, counts for very little. So Jackson whose account on the books is $517.55, admits that he owes $120, and it is by no means certain from his testimony, that he does not owe much more. And Downer, who is charged with $208.14, acknowledges that there is some question as to just how the account stands, although he claims that there is only a small balance one way or the other, not exceeding $20. This leaves Cook and Hoover, as the only ones, practically, with regard to whom there is any clear failure; and as the account against Cook amounts to but $120, that against Hoover is the one on which the case really stands. This amounts, however, to $1,822.60, and conceding that the discrepancy in it is serious, and cannot be explained away (except possibly to the extent of $100), the question is as to the effect to be given to it.

To this there is much to be said. It is not clear, in the first place, just what position counsel take with regard to these accounts, excepting the general one already referred to. It is conceded, for instance, that there was no representation, that the parties from whom they were due were solvent, or the accounts collectible, and that defendants would be responsible for any failure upon that score (although equally serious as any other), is expressly disclaimed. Neither is it contended, that every account must be made good to the dollar. All that is asked, as it is said, is that there should be substantially such an indebtedness as is shown; whatever that may mean. It is difficult also to see how we are going to try out in this suit the liability of the different parties whose accounts are claimed to fall short, and fasten responsibility for them on the defendants, without their having been put to the usual test by suit, although it is possible that this might have to be done. But passing these things by, there are others by which the plaintiffs are concluded.

The fundamental question is as to the responsibility assumed by the plaintiffs with regard to these accounts, including the representations which were made. As to the latter it is clear, that there were none which can be laid hold of here. All that was said, when inquiry was made about them, was the statement of the secretary, already referred to, that they had charged off the bad ones, and that those which were left were better than the ordinary. This falls far short of affirming that they were all good. They were so relatively, that is all. As was well known, they were accounts with agents, and as experienced men both

parties knew what that meant. When Mr. Baldwin says, that he expected to make more out of them than the defendants could, because he was taking over the business, he admits their uncertain character. Besides that, the statement with regard to them was nothing more than an expression of opinion to which however positive no one is held. Sawyer v. Prickett, 19 Wall. 146, 22 L. Ed. 105; Gordon v. Butler, 105 U. S. 553, 26 L. Ed. 1166; Haycroft v. Creasy, 2 East. 92; Belcher v. Costello, 122 Mass. 181; Deming v. Darlington, 148 Mass. 504, 20 N. E. 107, 2 L. R. A. 743. As said in Kimball v. Bangs, 144 Mass. 321, 11 N. E. 113:

"The law recognizes the fact that men will naturally overstate the value and qualities of the articles which they have to sell. All men know this, and a buyer has no right to rely upon such a statement."

The alleged misrepresentation is thus brought down to the bare fact that the defendants submitted a list of the accounts on the strength of which they got a higher price, possibly, for their business than they otherwise would, and that certain of these accounts have failed. But the list was nothing more than a transcript from the books, made out for the sake of convenience, every account being exactly as there shown. And as it did not change the accounts to take them off and foot them, the list amounted to no more than the books themselves. If then the defendants had submitted their books, and agreed to turn over the accounts upon them, to help make up the amount for which they held out, will it be seriously contended that they were guilty of artifice and fraud, because the expectations with regard to the accounts failed? This was but a part of the bargain, as it is to be remembered, into which many things entered, and the question here is not so much as to the inducement which it proved to the plaintiffs or the value realized as the use made of it by the defendants to bring the bargain about. This, so far as I can see, did not go beyond what is usual in ordinary bargaining and, if so, nothing like deceit can be made out of it.

But there is another insuperable objection to a recovery which applies to the whole case—the previous branch of it as well as this one—and that is, that no actual loss has been shown. In Smith v. Bolles, 132 U. S. 125, 10 Sup. Ct. 39, 33 L. Ed. 279, which was an action for deceit in the sale of certain mining shares, the jury were instructed that the measure of damages was the difference between the contract price and the value of the stock, if it had been what it was represented to be. In holding this to be error, it was said by Fuller, C. J.:

"What the plaintiff might have gained is not the question, but what he lost by being deceived into the purchase. The suit was not brought for breach of contract. The gist of the action was that the plaintiff was fraudulently induced by the defendant to purchase stock upon the faith of certain false and fraudulent representations. * * * If the jury believe from the evidence that the defendant was guilty of the fraudulent and false representations alleged, and that the purchase of stock had been made in reliance thereon then the defendant was liable to respond in such damages as naturally and approximately resulted from the fraud. He was bound to make good the loss sustained, such as the moneys plaintiff had paid out and interest, and any other outlay legitimately attributable to defendant's fraudulent conduct; but this liability did not include the expected fruits of an unrealized speculation. The reasonable market value, if the property had been as represented, afforded therefore, no proper element of recovery."

Sigafus v. Porter, 179 U. S. 116, 21 Sup. Ct. 34, 45 L. Ed. 113, was also an action for deceit in the sale of a gold mine. It was claimed that if the property had been as represented, it would have been worth $1,000,000, whereas, as it was, it was practically worthless. And the jury were again instructed, that this was the measure of damages. But this was reversed. "There are adjudged cases," says Mr. Justice Harlan, "holding to the broad doctrine that in an action for deceit, based upon the fraudulent representations of a defendant as to the property sold by him, the plaintiff is entitled to recover, by way of damages, not simply the difference between its real, actual, value at the time of purchase, and the amount paid for it by the seller, but the difference, however great, between such actual value and the value (in excess of what was paid), at which the property could have been fairly valued if the seller's representations concerning it had been true. So, in the present case (taking it to be as set out in the plaintiff's pleadings), although the defendant agreed to take, and the plaintiff agreed to pay, $400,000 for the property in question, the latter—according to some cases, interpreting literally the words used in them—could retain the property and recover by way of damages the difference between its real value at the date of purchase and the sum of $1,000,000, which the plaintiff alleged it would have been worth at that time if the representations of the defendant concerning it had been true. We held in Smith v. Bolles that such was not the proper measure of damages, that case being like this, in that the plaintiff sought damages covering alleged losses of a speculative character. We adhere to the doctrine of Smith v. Bolles." The rule laid down by Sanborn, J., in Rockefeller v. Merritt, 40 U. S. App. 666, 76 Fed. 909, 22 C. C. A. 608, was also quoted with approval, where he says:

"The true measure of the damages suffered by one who is fraudulently induced to make a contract of sale, purchase, or exchange of property, is the difference between the actual value of that which is parted with, and the actual value of that which he receives under the contract. It is the loss, which he has sustained, and not the profits which he might have made by the transaction. It excludes all speculation, and it is limited to compensation."

So in High v. Berret, 148 Pa. 261, 23 Atl. 104, the plaintiff having been induced to purchase 50 shares of stock of the par value of $100, in a mining company, organized to buy out another, brought an action of deceit, on the ground that false and fraudulent representations had been made as to the success of the old company, and the amount of ore in the mine; and he was allowed to testify at the trial that, if the representations had been true, the stock would have been worth $150 a share. In criticising this it is said by Williams, J.:

"His [plaintiff's] damages should equal the loss which the deceit, which the jury have found was practiced upon him, inflicted. The loss, in the transaction before us, is the difference between the real value of the stock at the time of the sale, and the fictitious value at which the buyer was induced to purchase. * * * His actual loss does not include the extravagant dreams which proved illusory, but the money he has parted with, without receiving an equivalent therefor."

There may be cases which are not in harmony with this doctrine, notably Walker v. Walbridge, 136 Fed. 19, 68 C. C. A. 569, decided by the

Circuit Court of Appeals of the Fifth Circuit (Shelby, J., dissenting), where the attempt is made to distinguish Smith v. Bolles and Sigafus v. Porter, as simply excluding speculative values. But that falls far short of appreciating what is there decided, which is nothing more nor less than that a person is not cheated, when that which he gets is worth all that he pays for it; which is also common sense. He may anticipate more, and be falsely led to expect it, on the strength of which he may be entitled to be relieved from the bargain. But if he holds onto it, he cannot claim damages for the deceit, if he has suffered no loss, which is the case, where, although not getting all that he had the right to expect, he gets after all the worth of his money.

The doctrine which is so established, and which is controlling here, was applied at the trial, but not to the extent that it might have been. It was there held, for instance, that taking the agents' balances, furniture, etc., the plaintiffs were bound to show, that what was realized from the one, and the value of the other, fell short of the $11,000 which was allowed for them. This was fatal to that part of the plaintiff's case, but it was more favorable to them, than they were entitled to, for it limited the question to these two items, disregarding the rest, and dividing up the consideration in a way which was not justified. The transaction was single and must be so treated. The one party sold and the other party bought, as a whole, the business and effects parted with. In bargaining together, the several things which entered into this may have been separately discussed and scheduled, and the value of each may have had its distinctive effect in bringing about the bargain. It is no doubt true, for instance, that $93,000 was allowed for the insurance in force, at the rate of $17 per 1000, and that, as a makeweight, the agents' balances, furniture, etc., were instrumental in securing the additional $11,000 demanded by the defendants. But the ultimate result cannot be separated into the different steps by which it was reached. However, as a matter of bargaining, the figures were arrived at, the contract as made was entire, and the consideration a whole one, and they must stand or fall together. In the end the defendants turned over certain assets —mortgages, loans on policies, lien notes, premiums due, the business of the company, including its relation to policy holders and to the agents who represented it, its furniture, fixtures, books, and supplies, and finally the much talked of agents' balances. And they got in return $104,515.30, less the amount required to make good the insurance reserve, which was figured at $52,741.54. Were the plaintiffs cheated in paying what they did? This depends, not on whether they realized their expectations, as to this, that, or the other part of it. But whether what they got was worth what they paid. To the extent that it was not—false representations inducing it being established—they might claim to have been cheated. If it was, they would not be, false representation or no false representation. And having failed to show this, they made out no case.

A nonsuit was therefore rightly entered, and the rule to show cause why it should not be taken off must be discharged.