## FARMERS' BANK OF McSHERRYSTOWN v. HALSEY, STUART & CO.

Circuit Court of Appeals, Third Circuit.
October 4, 1927.

No. 3529.

1. Sales ⟨⟩38(1)—Misunderstanding by buyer of representation made by seller is not misrepresentation which authorizes rescission.

Misunderstanding by buyer of a representation made by seller, or a representation so equivocal as to admit of varied understandings, does not constitute a misrepresentation which entitles buyer to rescind the contract.

2. Bonds ⟨⟩84—Where representation inducing sale, as mutually understood, is untrue, it amounts to misrepresentation, warranting rescission though made in good faith.

Where a representation made by seller which induced a sale of bonds was understood the same by both seller and buyer, and as so understood was untrue, it amounts to a misrepresentation which warrants rescission by buyer, though made in good faith, and such understanding is a question for the jury.

3. Bonds ⟨⟩84—Purchaser may accept and rely on representation by seller without verifying its accuracy.

Where a bond salesman has been instructed by his principal to make a certain representation respecting an issue of bonds, and does so, a proposed purchaser may in law accept and rely on it without searching its source.

4. Equity ⟨⟩71(1)—To constitute "laches" delay must have been to advantage of one party or to prejudice of the other.

"Laches," unlike limitation, is not a mere matter of time, but there must be proof of advantage to one party or prejudice to the other.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Laches.]

In Error to the District Court of the United States for the Middle District of Pennsylvania; J. Warren Davis, Judge.

Action at law by the Farmers' Bank of McSherrystown against Halsey Stuart & Co. Judgment of nonsuit, and plaintiff brings error. Reversed, and new trial awarded.

Stevens Heckscher and Duane, Morris & Heckscher, all of Philadelphia, Pa., for plaintiff in error.

Wm. Clarke Mason and John Murdock Clarke, both of Philadelphia, Pa. (Sullivan & Cromwell, of New York City, and Morgan Lewis & Bockius, of Philadelphia, Pa., of counsel), for defendant in error.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and DICKINSON, District Judge.

WOOLLEY, Circuit Judge. This writ is directed to a judgment of nonsuit; the single error assigned is the action of the trial court in entering it. A review of the trial on this specification of error, regrettably yet inevitably, calls for a statement of the pleadings and testimony at some length.

Speaking of the parties as they stand on the record, the plaintiff, Farmers' Bank of McSherrystown, is a Pennsylvania corporation engaged in banking business in the farming district near Gettysburg; the defendant, Halsey, Stuart & Co., is an Illinois corporation with offices in Philadelphia, New York, and elsewhere, operating as investment bankers in buying and selling securities. The plaintiff sued the defendant to recover the purchase price of five bonds of the Elder Steel Steamship Company of the par value of $1,000 each, which, it alleged in its statement of claim, it bought from the defendant on its representation that two ships, which composed the security for the bonds, "were fully insured against all marine perils, and that in addition the company's earnings or profits were insured, and that the interest on said bonds would therefore always be paid, whereas such statements as to the insuring of the company's earnings or profits were, in fact, untrue, and the defendants made the same with knowledge of the falsity and untruth of such representations or statements, and fraudulently intended to deceive plaintiff thereby." The plaintiff further averred default in interest payments, its rescission of the contract and consequent damage.

At the trial the plaintiff amended its statement of claim by words which transformed the action from one in deceit based on fraud to one in assumpsit based on the defendant's knowledge, which it had or ought to have had, "that the company's profits were not insured, but that the insurance covered only profits from contracts not performed because of the total loss of the ships by marine perils." This amendment was required—or, at least, it was justified—by an entire lack of evidence that the defendant fraudulently intended to deceive the plaintiff by the representations its salesman made. Thus when the plaintiff rested, the suit was for the recovery of the purchase price of the bonds on a contract which it had rescinded because of the defendant's misrepresentation however innocent, of a material matter by which the plaintiff, relying upon it, was induced to make the purchase. Pittsburg Life & Trust Co. v. Northern Central Life Ins. Co. (C. C. A.) 140 F. 888; American Knit Goods Mfg. Co. (C. C. A.) 173 F. 480; 3 Williston on Contracts, 2668.

The testimony is not in dispute. It should be noted that our discussion will be directed

to the testimony as it now stands on the record.

While adverted to by several witnesses, the precise representation in issue was stated in substantially the same words by Mr. Reigle, cashier of the plaintiff bank, and Mr. Paxson, bond salesman of the defendant company. The former testified that:

"On or about the 6th day of April, 1920, Mr. Edgar Paxson, who was then representing Halsey, Stuart & Company, bond brokers of Philadelphia or selling investment securities, came into our bank, and I took him into the directors' room, the directors being in session at that time, and, after preliminary greetings, he said, 'Gentlemen, I have something here to-day that I think is the best thing I ever offered,' and then he went on— he procured a circular that he had in his possession, and he went on and described this particular issue of bonds of what was called the Elder Steel Steamship Company, and he went on to explain the security back of these bonds, the amount of the issue or the amount that was loaned on each one of these two ships. There were two ships. One was a refrigerator ship and the other was just a general cargo ship. He also gave us the estimated earnings, which were then over fifty per cent. of the issue of bonds, and he said, 'Now, these boats are insured against all marine perils of any conceivable nature, but the best part of it is this,' he said, 'in addition the profits of the company are insured.' Then I said to him, 'Pax, are you sure—' we call him Pax. That is all we say to him when he comes in. We call him Pax instead of Paxson. I said, 'Pax, are you sure the profitis of this company are insured?' meaning the Elder Steel Steamship Company. He said, 'Yes, I am absolutely sure of it, but if you want me to do so, I will go back and I will verify this statement.' I says, 'You had better do that.' After he went out there was very little said about it at that time, because we didn't take any action until he came back the following week. He came back on the following Tuesday morning. The board was again in session, and I took him into the board room, and he said, 'Well, gentlemen, I am here to say that my statement I made last week is correct, and the profits of this steamship company are insured.' Then I remember that Mr. Hemler, who is sitting here at the table, and who was one of our directors and is one of our directors, said, 'It looks to me as though we couldn't lose one dollar on these bonds without the steamship company and the insurance company both would fail,' and after Mr. Paxson had gone out we discussed this matter, and the concensus of opinion of all the directors there was about the same, that we couldn't see any possible way in which we could lose a dollar if the profits of the Elder Steel Steamship Company were insured. We did not consider any other feature after that of that bond, because we thought that was sufficient, and on the strength of that we decided then and there that we would trade $5,000 Enid Gas & Electric Company's bonds for $5,000 of the Elder Steel Steamship Company's bonds."

To these comments by the directors in respect to his representation of insured profits, Paxson, so far as the testimony shows, made no reply. The parties completed the transaction by making the trade.

Paxson's testimony in respect to the representation was as follows:

"I said: 'Now, gentlemen, like all other maritime equipment issues, this equipment is insured against every conceivable maritime risk, but the bond has one additional feature that other maritime equipments that have come before my notice do not have, and that feature is that the profits of the company are insured.' At the end of that Mr. Reigle turned to me and he said: 'Paxson, that's a very remarkable statement and something very unusual,' and I said, 'Yes, Mr. Reigle, I agree with you that it is.' Mr. Reigle asked me to have that piece of information verified. I told him that I would take it up with my office and have it verified and see him probably the following week. I took it up with my office and had it verified and came back the following week. * * * The Board was in session. I told them that that statement was absolutely correct, the profits of the company were insured."

Paxson's representation of the security behind the bonds, if untrue, was not his own mistake for (whatever its meaning) a jury might find that it reflected quite accurately the understanding of the defendant, his principal, as indicated by the following circumstances: Before putting out this issue of bonds for sale, the defendant, pursuant to a business custom, called together its bond salesmen and gave them information as to the character of the bonds and their security, and instructed them as to their sale. There were two such meetings; one in Philadelphia addressed by a vice president of the company and the other in New York addressed by two vice presidents. Paxson attended both meetings. He testified that these gentlemen explained and discussed the bonds thoroughly, and stated that, "The steamers were insured against every possible marine risk that

could take place, but, in addition to that, there was one feature, and that was that the profits of the company were also insured." One of these officials, in closing the New York meeting, and referring to the other who had preceded him, said that the first speaker had given a description of the bonds to the salesmen "in every way, shape and form that he could. He said, in speaking of the insurance, 'Now, he has told you that the vessels are insured against every conceivable marine risk, and he has also said that the profits of the company are insured, and this seems to be almost too good to be true.'"

After the meetings, yet before the bonds were offered for sale, the defendant issued a Memorandum for Salesmen (Paxson receiving a copy) in which it again described the bonds, and under the head of "Insurance" said:

"These vessels are fully insured against all marine perils, and, in addition, the company's profits are also insured. This is a very strong point which does not occur in the case of an industrial or public utility issue."

Thus, thrice instructed by his principal in substantially the same words, Paxson, the bond salesman, made the representation in question to the directors of the plaintiff bank, holding in his hand at the time a circular, issued by the defendant, which, though marked for identification as one of its exhibits, is not in the record, obviously because of the intervening nonsuit. The defendant stresses the fact that though the circular was physically present, none of the plaintiff's directors asked to examine it. Neither did Paxson offer it to them. The defendant urges that had the plaintiff's directors availed themselves of the information at hand they could have discovered the true meaning of the representation as to insurance of profits, because the circular showed the character of insurance, first by reference to the trust mortgage, and second by reference to its insurance provision. This, in one aspect, is open to contradictions. Section 7 of article IV of the mortgage reads as follows:

"The company so long as any of the bonds issued hereunder and secured hereby are outstanding, covenants and agrees at its own expense to keep said steamships covered with responsible underwriters in good standing by hull insurance * * * and insurance on disbursements, earnings and profits or other forms of total loss insurance not exceeding such amount as hull underwriters will permit, in a total amount at least equal to the aggregate principal amount of the bonds. * * *

The hull policies shall cover against all risks usually covered by such policies including fire, with customary four-fifths running down clause, and Inchmaree clause. * * * *"

The alleged informing part of the circular, as read into the record, is in these words:

"In accordance therewith (that is, with the undertaking to keep the ships covered with insurance) the two steamers are fully insured in the highest class American and British companies against all marine perils, including fire and collision, and are also insued in the London Steamship Owners' Mutual Association, Limited, in both the protecting and indemnity classes."

We think it a matter for a jury to determine whether or not the insurance recital in the circular, if the directors of the plaintiff bank had read it, would have conveyed any information to them; and for the purpose of this discussion we shall assume that if they had seen the cited provision in the mortgage it might have conveyed to them the meaning which the defendant, in its brief, ascribes to it as follows:

(A) *Hull insurance*—which covered the vessel itself (and operating expenses and advance premiums) against all marine perils and risks, including fire and collision hazards; and

(B) Insurance of the profits—this insurance, covering the profits of existing charters, or the contracts under which the boats were operating at the time, would be payable in the event that the vessels were unable to carry out the charter obligations from some contingency which resulted practically in a total loss."

As we understand it, the defendant's construction of the cited mortgage provision and its interpretation of the representation first made by its officials to its salesmen and later by Paxson, a salesman, to the plaintiff's board of directors, are that insurance of the company's profits meant only insurance of the profits of a charter party whose performance had been rendered impossible by the total loss of the ship; not insurance of the company's profits in its general business as the plaintiff understood it.

[1, 2] The plaintiff's right of action, of course, rests on a misrepresentation, not on a misunderstanding of a representation, and not on a representation so equivocal in terms as to admit of varied understandings. Hallows v. Fernie, 18 L. T. N. S. Chancery, 1868; 3 Williston on Contracts, 2693. The learned trial judge, finding that profits were in one sense actually insured, held that the representation was therefore true and, in con-

sequence, the plaintiff had no complaint in law against the defendant, and, indeed, no complaint at all except of its own misunderstanding. But as we read the testimony (not as we interpret the representation) there appears a clear question whether or not the understanding of the plaintiff was the precise understanding of the defendant and the understanding which it intended to convey, and did convey, to the plaintiff when it made the representation through its salesman. If it was, that is, if the words and attendant circumstances show it, then the representation as to insurance of profits was different from the mortgage provision and was untrue, and the mere accident of truth in the other sense of the mortgage provision would not save the representation from being misleading or save the defendant, however, innocent or mistaken, from liability for inducing the plaintiff to enter into a contract on a representation different from what the mortgage authorized. Concededly the plaintiff bought the bonds on the defendant's representation, not on the mortgage representation, for that had not come to its notice; and it may be the plaintiff bought them on its understanding expressed to the salesmen when it asked him to have his representation verified and that his subsequent verification was of the representation thus understood. Whether or not the representation was made by one party and received by the other with the same meaning can only be decided when the defendant puts in its testimony; but in the plaintiff's testimony introduced before nonsuit—regarding it as true and attributing to it all inferences favorable to the plaintiff under the familiar rule—there is a fair question as to what the parties meant when one made and the other received and acted upon the representation, and as to whether both meant the same thing, and whether that thing was the insurance of the general profits of the company as distinguished from insurance of charter party profits effective only in the event of the total loss of a ship. And we think that was a jury question and the court fell into error in not submitting it, unless, as the defendant insists, the plaintiff's conduct was such as to preclude it from rescinding the contract and recovering the purchase price of the bonds.

[3] The conduct first complained of relates to the plaintiff's failure to ask for and read the defendant's circular when in the hand of its salesman. We discern no legal duty resting on the plaintiff to verify the salesman's statements, when, speaking for his principal who had held him out as its agent, he made

an offer of sale. However, if the plaintiff's duty were otherwise and its directors had demanded and read the circular, a jury might find that it would have availed them nothing because, as we read the quoted paragraph, the circular said nothing about insurance of profits. But the defendant says the circular referred to the mortgage and the plaintiff was in duty bound to call for and read the mortgage before it bought the bonds. Such a duty, concededly, might exist in certain circumstances, Van Weel v. Winston, 115 U. S. 228, 6 S. Ct. 22, 29 L. Ed. 384, but where the principal has instructed his salesman in respect to the provisions of a mortgage security, and, in the modern method of marketing bonds, has sent him forth to prospective purchasers with authority to repeat his instructions and make representations in accordance therewith and the salesman has done so, the proposed purchaser may in law accept those representations as true and may act upon them without searching their source. Venezuella Central R. Co. v. Kisch, L. R. 2 H. L. (Eng.) 99120. Any other rule promulgated in the light of such transactions daily occurring by the thousand throughout the country would relieve every investment banker from all liability for misrepresentations (except, perhaps, when fraud is involved) and burden every one who contemplates entering into a contract for the purchase of bonds with the rule of caveat emptor applicable to the purchase of chattels.

Opposed to the contention made by the defendant that its customers should not rely upon the representations of its salesmen, the plaintiff goes to the other extreme and maintains that when investment bankers offer marine securities to customers residing in an interior farming region, they are in law bound to make more elaborate explanations than to customers familiar with the seas. We have not been persuaded by this reasoning. The duty is neither geographical nor industrial; it is legal; and it is the same wherever the banker vends securities on oral offerings. It requires him to make a truthful, accurate and adequate representation so that a vendee may not be misled into an unfortunate purchase. The duty is the same whether he is selling marine securities to a farmer in the Middle West or irrigation securities to a mariner on the seaboard.

And, finally, the defendant in its brief charges laches to the plaintiff because of lack of diligence in rescinding the contract.

[4] The record, however, fails to disclose that this matter was presented to and ruled upon by the trial court or that it otherwise in-

fluenced its judgment. Moreover, the question, very naturally, is not here on the plaintiff's writ of error and therefore it is not here at all. It is a matter which the defendant formally pleaded as a defense, and because of the interposition of the nonsuit it had neither opportunity nor occasion to sustain it by proofs. Proof that the plaintiff's delay gave it some advantage or subjected the defendant to some prejudice is necessary, for laches, unlike limitation, is not a mere matter of time. Galliher v. Caldwell, 145 U. S. 368, 372, 12 S. Ct. 873, 874, 36 L. Ed. 738; Southern Pacific v. Bogert, 250 U. S. 483, 39 S. Ct. 533, 63 L. Ed. 1099. Therefore this defense when reached is for the trial court, to be disposed of according as the testimony is disputed or undisputed.

Also the question of the salesman's lack of authority to make the representation, pleaded as a defense, is not here on the plaintiff's writ of error.

We are constrained to reverse the judgment below and award a new trial in harmony with this opinion.