## FARNSWORTH *v.* DUFFNER.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF WEST VIRGINIA.

No. 69. Argued November 4, 1891. — Decided December 14, 1891.

In a suit in equity for the rescission of a contract of purchase, and to recover the moneys paid thereon on the ground that it was induced by the false and fraudulent representations of the vendor, if the means of knowledge respecting the matters falsely represented are equally open to purchaser and vendor, the former is charged with knowledge of all that by the use of such means he could have ascertained: and *a fortiori* he is precluded from rescinding the contract and from recovery of the consideration money if it appears that he availed himself of those means, and made investigations, and relied upon the evidences they furnished, and not upon the representations of the vendor.

Statements by a vendor of real estate to the vendee, (made during the negotiations for the sale,) as to his own social and political position and religious associations, are held, even if false, not to be fraudulent, so as to work a rescission of the contract of sale.

It is no ground for rescinding such a contract that the agents of the vendors, who had received the full purchase money agreed upon, misappropriated a part of it.

THE court stated the case as follows:

On February 26, 1879, a tax deed was executed by the clerk of the County Court of Upshur County, to George Henning and others, for a tract of land supposed to contain forty thousand acres. The grantees in this tax deed were twenty-two in number, who had entered into a written agreement on December 11, 1877, to purchase the land at a tax sale in that month. On April 24, 1883, this agreement for the purchase of this land was executed:

"We, the undersigned, agree to and with George Henning & Co., and bind ourselves to do certain things (through and with the committee of said company, viz., D. D. T. Farnsworth, Jackman Cooper and P. Thomas) as follows: We agree to pay to said committee fifteen thousand dollars for a certain tract of 40,000 acres of land, known as the Wm. H. Morton land, that was sold for non-payment of the taxes and bought by said George Henning and others, to whom the State of West Virginia made deed, etc., one hundred dollars of which sum in hand paid to said committee, two thousand dollars to be paid to said committee at the Buckhannon Bank on the 4th of May, 1883, the residue of said fifteen thousand dollars to be paid at the time of the making of a deed for said land, said deed to be made within forty days or as soon thereafter as possible. The deed shall convey all the rights and title to said land as conveyed by the State in a deed made to said company; the deed to be made to Joseph Duffner, Charles Duffner and Matthew Duffner (the undersigned), with the guarantee that the said tract of land shall contain at least twenty thousand acres not legally held by actual settlers within the boundary of said tract of 40,000 acres; but in the making of the deed for said land it shall provide that all the actual settlers within boundary who have been in peaceable possession for ten years according to law, and have paid the taxes on their claim or title shall not be disturbed by any attempt in law from their boundaries so held by deed or title; all the rest of said 40,000 acres is to be held by the under-

signed. Now, if the said D. D. T. Farnsworth, Jackman Cooper and P. Thomas shall make or cause to be made to us, the undersigned, a deed as above stated for said 40,000 acres, we will faithfully perform our obligations herein made."

" Witness our hands and seals this day and year of our Lord, April 24, 1883.

" CHARLES DUFFNER.    [SEAL.]

" JOS. DUFFNER.    [SEAL.]

" MATTHEW DUFFNER.    [SEAL.]

" P. S. We agree also to pay the taxes on said land for the year 1883."

Thereafter a deed was made in pursuance of this agreement. The deed was dated May 12, 1883, but not in fact delivered until July 14, 1883. It purported to grant " all the rights, title and interest vested " in the grantors by the tax deed heretofore referred to, which was specifically described. It also contained this provision, in reference to settlers on the tract :

" The parties of the first part herein named convey the above-named 40,000 acres of land to said parties of the second part herein named with the provisions that all of the actual settlers within the boundaries of said survey, who have been in peaceable possession for ten years previous to this date, according to law, and, having paid all of the taxes on their claim of title to any of said land, shall not be disturbed by any attempt or action in law from their boundaries so held by them by deed as aforesaid; but all of the residue of said 40,000 acres is herein conveyed to the parties of the second part and held by them with the guarantee that said tract or survey of land shall contain at least 20,000 acres not legally held by actual settlers, as above named and provided for, within said boundary of 40,000 acres; but if in case the quantity of land in said survey should prove to be less than 20,000 acres after deducting the number of acres legally claimed and held by actual settlers, as above herein named, then the parties of the first part, grantors, who now constitute the legal owners of said tract of land which was sold for the non-payment

of the taxes due thereon in the name of William H. Morton, are to refund back to the said Duffners, parties of the second part, in proportion per acre for any deficiency of land below or less than 20,000 acres in said survey."

On February 12, 1886, Joseph Duffner, who had in fact advanced all the money for the purchase of this land, and who had succeeded to the rights of his associates in the deed, filed his bill in the District Court of the United States for the District of West Virginia, setting forth the fact of his purchase and the amount of money paid, and alleging that the purchasers were induced to purchase through the false and fraudulent representations of the several grantors, such false and fraudulent representations being set out in full; also, that the tax deed was void, and conveyed no title to any land by reason of three matters specifically pointed out; and praying a decree that the several grantors be adjudged to return to him the moneys by him paid, in proportion to their several interests as grantors in the conveyance. To this bill the defendants answered separately. Thereafter, on pleadings and proofs, the case was submitted to the court, and a decree entered in favor of the plaintiff in accordance with the prayer of the bill, setting aside the contract of April, 1883, and adjudging that the several defendants pay to the plaintiff their proportionate amounts of the moneys paid by him. The amounts thus decreed against two of the defendants, Daniel D. T. Farnsworth and Philip Thomas, being each over five thousand dollars, they have appealed to this court.

*Mr. H. J. May,* (with whom was *Mr. A. H. Garland* on the brief,) for appellants, cited: *Randall* v. *Howard,* 2 Black, 585; *Adams* v. *Alkine,* 20 West Va. 480; *Overton* v. *Davisson,* 1 Grattan, 211; *Shank* v. *Lancaster,* 5 Grattan, 110; *Slaughter* v. *Gerson,* 13 Wall. 379; *Yeates* v. *Pryor,* 11 Arkansas, 58; *Farrar* v. *Churchill,* 135 U. S. 609; *Thompson* v. *Jackson,* 3 Randolph, 504; *Carroll* v. *Wilson,* 22 Arkansas, 32; *Jackson* v. *Ashton,* 11 Pet. 229; *Sutton* v. *Sutton,* 7 Grattan, 234; *Abbott* v. *Allen,* 2 Johns. Ch. 519; *Gouverneur* v. *Elmendorf,* 5 Johns. Ch. 79, 84; *Hill* v. *Bush,* 19 Arkansas, 522; *Walker*

v. *Hough,* 59 Illinois, 375; *Pasley* v. *Freeman,* 3 T. R. 51, 56; *Ludington* v. *Renick,* 7 West Va. 273; *Summers* v. *Kanawha County,* 26 West Va. 159; *Whiting* v. *Hill,* 23 Michigan, 399; *Pratt* v. *Philbrook,* 41 Maine, 132; *Bridge* v. *Penniman,* 105 N. Y. 642.

*Mr. Henry M. Russell,* for appellee, cited: *Andrus* v. *St. Louis Smelting &c. Co.,* 130 U. S. 643; *Boyce* v. *Grundy,* 3 Pet. 210; *Farrar* v. *Churchill,* 135 U. S. 609; *Halsted* v. *Buster,* 140 U. S. 273; *Dickinson* v. *Railroad Co.,* 7 West Va. 390, 425; *Stewart* v. *Wyoming Ranch Co.,* 128 U. S. 388; *Barton* v. *Gilchrist,* 19 West Va. 223; *McCallister* v. *Cottrille,* 24 West Va. 173; *Simpson* v. *Edmiston,* 23 West Va. 675.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

This is a suit for the rescission of a contract of purchase, and to recover the moneys paid thereon, on the ground that it was induced by the false and fraudulent representations of the vendors. In respect to such an action it has been laid down by many authorities that, where the means of knowledge respecting the matters falsely represented are equally open to purchaser and vendor, the former is charged with knowledge of all that by the use of such means he could have ascertained. In *Slaughters' Administrator* v. *Gerson,* 13 Wall. 379, 383, this court said: "Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's misrepresentations. If, having eyes, he will not see matters directly before them, where no concealment is made or attempted, he will not be entitled to favorable consideration when he complains that he has suffered from his own voluntary blindness, and been misled by overconfidence in the statements of another. And the same rule obtains when the complaining party does not rely upon the misrepresentations, but seeks

from other quarters means of verification of the statements made, and acts upon the information thus obtained." See also *Southern Development Co.* v. *Silva*, 125 U. S. 247; *Farrar* v. *Churchill*, 135 U. S. 609. In *Ludington* v. *Renick*, 7 West Va. 273, it was held that " a party seeking the rescission of a contract, on the ground of misrepresentations, must establish the same by clear and irrefragable evidence; and if it appears that he has resorted to the proper means of verification, so as to show that he in fact relied upon his own inquiries, or if the means of investigation and verification were at hand, and his attention drawn to them, relief will be denied." In the case of *Attwood* v. *Small*, decided by the House of Lords, and reported in 6 Cl. and Finn. 232, 233, it is held that " if a purchaser, choosing to judge for himself, does not avail himself of the knowledge or means of knowledge open to him or to his agents, he cannot be heard to say he was deceived by the vendor's representations." And in 2 Pomeroy's Equity Jurisprudence, section 892, it is declared that a party is not justified in relying upon representations made to him — " 1. When, before entering into the contract or other transaction, he actually resorts to the proper means of ascertaining the truth and verifying the statement. 2. When, having the opportunity of making such examination, he is charged with the knowledge which he necessarily would have obtained if he had prosecuted it with diligence. 3. When the representation is concerning generalities equally within the knowledge or the means of acquiring knowledge possessed by both parties."

But if the neglect to make reasonable examinations would preclude a party from rescinding a contract on the ground of false and fraudulent representations, *a fortiori* is he precluded when it appears that he did make such examination, and relied on the evidences furnished by such examination, and not upon the representations.

It becomes necessary now to state some facts appearing in the record, facts that are undisputed, and coming from the lips of plaintiff and his witnesses. Matthew Duffner, the son of plaintiff and one of the three parties in the contract and deed, was in partnership with a man by the name of Wood.

This partner informed him that he had a cousin, one Colonel Wood, living near Oakland, Maryland, who had lands for sale. A few weeks after receiving this information Duffner called on Colonel Wood, and was shown by him a map of this land, located within a few miles of Buckhannon, in Upshur County, West Virginia. By arrangement the three Duffners met Colonel Wood at Clarksburg, and went with him to Buckhannon with a view of examining the land. Soon after their arrival Colonel Wood became intoxicated and took no further part in the transaction. While there they met the two appellants and Jackman Cooper (and this was the first interview or communication between the parties) and entered into the contract of April 24, 1883, with them as a committee on behalf of all the owners. Prior, however, to this they had gone on to the land in company with Watson Westfall, who was, or had been for years, the surveyor of the county, spending the time from Saturday morning until Tuesday night in going to, examining, and returning therefrom. After executing this contract the Duffners returned to Cleveland. Having been advised that the deed was executed and ready for delivery, and in July following, this plaintiff, with a lawyer from Cleveland — Mr. Fish, a gentleman who had been acting as his counsel for fifteen or twenty years, a lawyer of experience, sixty-four years of age — went to Buckhannon. He took Mr. Fish with him for the purpose of having him examine the title and the deed. On arriving at Buckhannon, Mr. Fish proceeded to make such investigation as he deemed sufficient; and after three days passed in an examination of the records and a study of the statutes of the State, he advised Mr. Duffner to take the deed; and on the giving of such advice Mr. Duffner received the deed and paid the balance due on the contract. After this, having missed the train, Mr. Fish remained another day in Buckhannon, and continued his examination of the records; and on his way home stopped at the State capital to see if proper returns had been made to the State auditor's office. The result of all his investigations was satisfactory; and, as both plaintiff and Mr. Fish testify (and their testimony is corroborated by many witnesses, and contradicted by none), it

was after Mr. Fish advised him to take the deed that he took it and paid his money.

But one conclusion can be deduced from these facts — and that is, that the plaintiff did not rely upon any representations made to him by the defendants, but through his own counsel made investigation of the title, and purchased on the strength of that counsel's opinion thereof. Within settled rules, he is, therefore, now precluded from rescinding this contract on the ground of such representations.

But the case does not rest on this alone. Thus far we have considered only such facts as are disclosed by the testimony of the plaintiff, his son, and his counsel. Let us look at some of the testimony produced by the other side. Frederick Brinkman, an apparently disinterested witness, testifies that he met plaintiff on his several visits to West Virginia; and, hearing from him that he was coming there to buy land, cautioned him against West Virginia land titles, calling them " polecat " titles, and advised him before purchasing to consult some of the local lawyers, naming three or four of them. To which plaintiff replied that he would be careful, and that before purchasing he would bring his own counsel from Cleveland; and added that he was a good lawyer, and one in whom he had confidence. Again, while Mr. Fish was making his examination of the records in the county office, three or four of the defendants were present; and some one or more of them said to him, in the presence of the plaintiff, that some people called their title a wildcat title; and they wanted him to make a full examination, and be satisfied that it was good, " for they wanted no after-claps or further trouble about the land thereafter." So we have not only equal means of knowledge, but also an actual examination by the purchaser through his counsel; a completion of the contract when, and only when, his counsel advises him that the title is satisfactory; a prior caution to the purchaser that land titles in West Virginia were doubtful, and his reply that he proposed to rely upon the advice of his own counsel; and the further declaration of the defendants to such counsel, in the presence of the purchaser, before the completion of the contract, that they de-

sired a full examination, in order that there might be no after trouble. Surely, if there ever was a case in which the doctrine of *caveat emptor* applies, this is one.

It may be well now to notice the three matters which are alleged in the bill as invalidating the title : First, that there was no note or record of any kind in the office of the clerk of the county court of Upshur County of the sheriff's report of his sale, until the 10th day of January, 1878, which was more than ten days after the sale; which omission, counsel says, has been decided by the Supreme Court of West Virginia to invalidate a tax deed. But this was a defect apparent on the records, the very records which Mr. Fish was examining. Second, that William H. Morton, in whose name the land was returned delinquent for the non-payment of the taxes of 1876, never had any valid title; his only claim of title resting in a series of fraudulent papers, admitted to record in the county of Upshur on the 16th day of February, 1876. Then follows a statement of the instruments in that chain of title, to which the bill adds : "From this it will be seen that all of these papers except the last were admitted to record upon certificates purporting to have been made on the 24th day of February, 1867, which was Sunday, by one Frederick Bull, who only goes so far as to certify to the papers as copies of the papers which were then produced before him." But this chain of title, as the bill avers and the testimony shows, was on the records, and was examined by Mr. Fish ; and it also appears that Mr. Fish noticed that one of these instruments at least, thus placed on record, was not an original instrument, but only a copy. So the defect was not only one which could have been noticed by Mr. Fish, but also, so far as the objection runs to the record being of a copy of an instrument, was in fact perceived by him. Thereafter he examined to see that this tract of land was listed for that year in the name of Morton only ; and concluded that, as tax proceedings are proceedings *in rem* against the land, they were not vitiated by any defect in the chain of title to the party in whose name the land was listed. Third, it was alleged that the title under the tax deed was void, because the tract of land described therein was and is

owned by other persons claiming under and owning by supe-rior patents. And then the bill sets out some eleven patents, issued between 1785 and 1793, for large tracts of land, which patents, the bill alleges, covered and included the tract in controversy. But these, too, were facts appearing on the public records.

It is worthy of remark here, that in the latter part of the eighteenth century it was a common practice for the State of Virginia to make grants of large tracts of lands in the then unoccupied portions of the State now included in the State of West Virginia, the boundaries of which grants were often con-flicting and overlapping. Hence arose, under authority of the statutes, a form of patent known as an "inclusive" grant. Grants of that nature were before this court, and considered in the cases of *Scott* v. *Ratliffe*, 5 Pet. 81; *Armstrong* v. *Morrill*, 14 Wall. 120; and *Halsted* v. *Buster*, 140 U. S. 273. So the exact tract of land which any of these patentees actually acquired could only be determined after surveys, and a com-parison of the dates of the entries, surveys and patents. And as the descriptions in tax proceedings followed those in patents and other deeds, — lands being listed in the names of the owners according to the system then obtaining in that State, — the same uncertainty of boundary existed as to lands held by tax titles. But with reference to all these matters, alleged as defects in the title, it is enough to say that they were apparent on the records, were open to the inspection of plaintiff and his counsel, and as to one of them at least, it was a defect first noticed by Mr. Fish, and deemed by him insufficient to destroy the tax title.

So far as respects the matter of settlers on the land — settlers having occupied portions long enough to acquire title by occu-pancy — both the contract and the deed give notice of that fact, and make provision therefor. It also appears that the Duffners made a general examination of the land before the contract was entered into, and spent three nights at the house of Isaac W. Simons, a settler claiming title by occupancy, who, as he testifies, notified them of his claim of title. As the plain-tiff after his purchase never caused a survey to be made of the

land, and never sought to find out how much of the ground was occupied by these settlers, it is still an unsettled question how much of the forty thousand acres described in the tax deed was within the limits of prior grants, or in fact so occupied.

We now pass to a notice of the particular matters of fraud alleged in the bill; and the first is, that the defendants knew that their title was worthless, and with this knowledge, deliberately represented it to be good for the sake of inducing the purchase. The matters in the testimony which are relied upon to substantiate this charge are, that the title was in fact worthless; that there was talk in the community to that effect, which had come to the knowledge of defendants; that such an opinion had been given by a prominent lawyer, at one time a judge of the Supreme Court of that State, as was known to them; the presumption from their long residence in the community that all would have known, and the fact that some did know, of the existence of these conflicting grants; and the testimony of Mr. Fleming, a lawyer in Buckhannon, that these appellants stated to him he might be called upon to advise as to the title, and intimated that an opinion in its favor was desired, and that they would pay him for his services. But, as against these matters, it appears that these defendants were not lawyers, but farmers and business men, not possessing or pretending to possess that knowledge of the law which would enable them to determine as to the validity of the title; that they advanced not only the money for the purchase in the first instance, but continued during the succeeding years and until this sale to pay the taxes, the amount of taxes thus paid being, as stated by the county clerk, $2983.82, and the total amount paid by these defendants in one way and another, towards perfecting their title, according to the testimony of one of the defendants, being $3150.67; that they did not pretend that the title they were selling was other than a tax deed; and that they indicated in the papers the tax deed on which their title was based, and referred the purchaser to the records by which the validity of their title could be determined. While they may have known, as is generally known, that there is an uncertainty about a tax title, yet they had confidence enough in it to invest

their money therein for a series of years, and to invite the purchaser to an examination of the record evidences thereof.   So far as respects the testimony of Mr. Fleming, the lawyer, it is proper to say that he does not testify that there was any direct suggestion to the alleged effect, but simply that he obtained an impression from the general tone of the conversation, while these appellants positively deny that there was any suggestion or thought on their part of anything improper ; and say that they simply notified him that they might be asked to name some local lawyer to examine the title for the purchaser, and that they should take pleasure in recommending him.

Again, it is charged that these defendants surrounded this purchaser and his counsel and succeeded in preventing them from having conversations with other citizens, or making inquiries of them, and ascertaining such facts or reports as might have been gathered from such inquiries.   But any attempt of this kind is denied by all.   It was natural that they should be interested in making a sale, and that they should do what they could to show attentions to the purchaser and his counsel, and should be often with them ; but it does not appear that they hindered them in any way from making such inquiries and investigations as they desired.   On the contrary, their testimony is that they urged them to make full inquiry and investigation before consummating the purchase.

It is further charged in the bill that, "in order to induce said plaintiff to accept and confide in the said representations as to the validity of the said title, and in order to prevent the said plaintiff from making inquiries in other directions respecting the same, the said Daniel D. T. Farnsworth, at the time of making the said representations respecting the said title, also represented to the said plaintiff that he, the said Daniel D. T. Farnsworth, had been governor of the State of West Virginia and a member of the senate of the same State, and was at the time of making such representations the president of a bank and the president of a railroad company and a member of the Baptist Church, and had heretofore built a church edifice, which he pointed out to the said plaintiff, and that he was not such a man as would deceive or take advantage of the said plaintiff,

or would have anything to do with titles to land unless they were good titles."

According to the plaintiff's testimony, it would appear that these statements were made before the signing of the original contract. According to Mr. Farnsworth, that, while he did make statements of that character, it was only after the contract was signed, and while walking about the city with the plaintiff, and in response to inquiries made by him. But, further, the testimony of Mr. Farnsworth is that those matters concerning himself, thus stated, were true, and there is no suggestion anywhere that they were not true. If true, they certainly were not false and fraudulent representations, and, if false, they were not of a character to invalidate a contract. It would hardly do to hold that a party was induced into a contract by false and fraudulent representations, because one of the vendors represented that he had been governor of the State, and was a member of the church, and president of a bank and a railroad company.

One other matter alone requires notice. It appears that in the talk preceding the contract of purchase the committee had named $20,000 as the price of the land, and had asked a further sum of $1500 for their own services; but that the final outcome of the negotiations was the fixing of $15,000 as the price of the land, and $6500 to be paid to these two appellants for their services. It is enough to say, that whatever wrong these appellants were guilty of in making this change, was a wrong to their associates and not to the purchaser. It is not a matter he can complain of. The full amount which he had to pay was the amount they named in the first instance, to wit, $21,500, and if in fraud of the rights of their associates they changed the distribution of that sum, it was a wrong which only the parties injured can take advantage of.

This is the whole case presented by the record. The vendors pretended to sell only a tax title. They specially guarded themselves against any rights of actual settlers. The validity of their title and the extent of it were matters apparent on the records, and open to the inspection of the purchaser. He did not act on their representations that the title was good, but

brought his own counsel from home to examine those records, and acted upon his judgment of the title. The conduct of the defendants supports their testimony, that they believed there was validity to their title. The particular statements complained of as against one of these appellants were true in fact, and, if not true, were not of a character to avoid the purchase. The wrong which these two appellants are specially charged to have been guilty of was a wrong against their associates and not against the purchaser, nor one of which he can take advantage. It follows, therefore, that there was no such showing made as would justify a court in rescinding the contract of purchase, and decreeing a repayment of the money.

*The decree will be reversed, and the case remanded, with instructions to dismiss the bill as to these appellants.*

MR. JUSTICE GRAY did not hear the argument or take part in the decision of this case.