## MURRAY et ux. v. PAQUIN.

(Circuit Court, W. D. North Carolina. September 16, 1909.)

1. VENDOR AND PURCHASER (§ 31*)—CONTRACT OF SALE—VALIDITY OF ASSENT—RESCISSION FOR MISTAKE.

To warrant the rescission by a court of equity of an executed contract for the sale of land on the ground of mutual mistake, the mistake must be material and so important that, if it had not been made, complainant would not have made the contract.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 35–37; Dec. Dig. § 31.*]

2. VENDOR AND PURCHASER (§ 31*)—CONTRACT OF SALE—VALIDITY OF ASSENT—RESCISSION FOR MISTAKE.

A purchaser of real estate is not entitled to a rescission of the contract in equity on the ground of a mistake of fact, where there was no misrepresentation, and the means of ascertaining the true facts were open to complainant equally with defendant, and he did not make use of them.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 35–37; Dec. Dig. § 31.*]

3. VENDOR AND PURCHASER (§ 31*)—CONTRACT OF SALE—VALIDITY OF ASSENT—RESCISSION FOR MUTUAL MISTAKE.

Complainants, who were husband and wife, purchased from defendant a residence property in Asheville, N. C., where the wife intended to reside temporarily on account of poor health. The chief consideration which led to the selection of such property was its location and the adaptability of the house to the wife's needs. Defendant delivered a deed which described the boundaries of the lot, and which complainants had examined by an attorney. A subsequent survey disclosed that the western boundary at the back end of the lot was further to the eastward than was supposed by either party, and ran through the barn which had been built by defendant. No willful misrepresentation by defendant was claimed. *Held*, that the mistake as to the line did not entitle complainants to a rescission of the contract, since they had an opportunity to ascertain the true boundary before completing the purchase, and it did not appear that if it had been

known it was of such importance that they would have refused to take the property.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. § 36; Dec. Dig. § 31.*]

In Equity.

Davidson, Bourne & Parker, for complainants.
Alf. S. Barnard, for defendant.

NEWMAN, District Judge. This is a bill brought by the complainants against the defendant to rescind and cancel an executed contract for the sale of real estate in the city of Asheville. The bill alleges that the complainants are citizens of Ohio and residents of Cleveland in that state, and that the defendant is a citizen of North Carolina and an inhabitant of the Western district of North Carolina, living in Asheville. It is then alleged that, some time in the spring of 1905, the health of Mrs. Nellie Murray became so impaired that it became necessary for her to come South to secure the benefit of a milder climate; and, being so advised, she came to Asheville, secured a temporary residence in the city, and took up the matter of employing a physician who might aid her in the restoration of her health; that before coming to Asheville she heard of the defendant as a physician in St. Louis, Mo., where he had professionally treated her brother; and that, induced by these considerations, among others, she called upon him and engaged him to treat her. She became his patient, and remained so for about two years, during which time the defendant acquired not only professional, but personal, confidence and friendship of Mrs. Murray, and of her husband, George R. Murray, who frequently came to Asheville to visit her and look after her welfare and comfort as often as his business would permit, and close personal relations were established between the defendant and the complainants, which continued uninterrupted until some time after the purchase of the property in controversy. During this period Mrs. Murray returned to her home in Cleveland, but remained only a short time, it being doubtful whether she would be able to retain her health there; and it became necessary for her to return to Asheville, and with that in view she and her husband formed a determination to purchase a house in Asheville for her to occupy as long as her comfort and convenience might require, her husband to visit her as often, and remain as long, as his business would permit; that this decision was communicated to the defendant, and that he gave his most hearty approval, and expressed full confidence that by carrying it into effect the health of Mrs. Murray could be restored. He was asked by the complainants to assist in the selection of a proper place for the purpose. In response to this, defendant procured from real estate agents in Asheville a long list of properties offered for sale, and discussed them with Mrs. Murray and her husband; but to the most of them the defendant suggested objections. He then proposed to sell them the house and lot which he occupied as a home on Pearson Drive, in the western part of Asheville, representing it to be eminently suited for their purposes, and stated that it was

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the only available property in Asheville which did entirely fill the requirements of her condition. The defendant at that time lived upon the lot, which had on it the dwelling (consisting of seven rooms, besides attics and closets), and a barn in the rear, capable of holding a couple of horses and a carriage. The lot fronted on Pearson Drive, which is a popular residence street in Asheville, and on the east and northeast was an alley which separated it from the adjoining property. On the west and northwest, at the time of the negotiation and purchase, the defendant represented the line to begin near a certain bush or sapling on the northern margin of Pearson Drive, and to run practically north, intersecting the alley heretofore referred to, and thus forming a triangle, the base being upon Pearson Drive and the apex at the intersection of the line last named. Diagram of the lot is attached.

The defendant claimed and represented that the true westerly line began near the bush or sapling on the north margin of Pearson Drive, and ran in a general direction north to the intersection of the alley shown on the plat from the letter "A" to the letter "B," and for a considerable portion of that line from the alley southward there was a fence separating this lot from that adjoining it on the west, and the barn aforesaid was situated wholly east of the said line. These lines were shown to complainant George R. Murray before the conclusion of the negotiations. Complainants having absolute confidence in the friendship of the defendant, relying implicitly upon his statements to

them, and there being no suggestions from any source whatever, either by the owners of the adjacent lots or any one else, that the line so claimed and represented by the defendant to be the true line was not the true line, and the said lot being bound on the south by a much-frequented and popular highway, viz., Pearson Drive, and on the east and northeast by the alley, there was no necessity, so far as they could see, and so far as they could believe that the defendant could see, for any actual survey. The defendant represented that the lot was 197 feet by 240 feet, thereby conveying the impression upon the minds of the complainants that the front on Pearson Drive was 197 feet and the back would approximately be 240 feet. Having this understanding, Murray and his wife decided to accept the property and complete the purchase, and paid the purchase price of $5,500, and defendant executed a deed to the complainant, copy of which is attached to the bill. It is alleged that there is no intimation or suggestion from any quarter that there was any trouble about the line; and, if the line had been as supposed, it would have been practicable to divide the lot by a line beginning on Pearson Drive and running thence back to where it would intersect with the line on the western side of the alley, and thus give space for two comfortable dwellings, both fronting on Pearson Drive. Much of the negotiations were conducted by correspondence between George R. Murray and the defendant. When Murray and his wife came to Asheville about the end of 1906 to take possession of the house, for which payment had been made, the condition of the house was such that it was not desirable for Mrs. Murray to occupy it, and it was thereupon determined to subdivide the lot, move the house to the eastern portion of the lot, and build another house on the western portion; both houses fronting on Pearson Drive. Contracts were duly entered into for this work; but, when the architect came to locate the foundation for the new house to be built on the western division, it was found in the first place that the true frontage on Pearson Drive was but about 148 feet. This fact was immediately called to the attention of Paquin, and became the subject of some verbal communication between George R. Murray and Paquin; and complainants still believing that, even with the reduced frontage, if the western line was correct, they could yet utilize the lot for the purposes of two houses, they refrained from making any demand for any correction or abatement in the price from the defendant. But when they endeavored to locate the foundation for the new house on the western subdivision, the architect discovered through actual measurement, and brought the fact to the knowledge of the complainants for the first time, that the representations of the defendant as to the true location of the western line were not true;' but, on the contrary, the true line began on Pearson Drive near the bush or sapling mentioned and ran in a northerly direction as shown on the diagram and the plan from "A" to "C," leaving the whole of the fence, which had been represented and believed to be upon the true line, west of that line, and leaving a greater part of the barn which the defendant had built and occupied, and which he represented to be entirely on the lot sold to the plaintiff, also on the west side of the line. This so nar-

rowed and contracted the lot, especially at the point where it was necessary to locate a new house, as to destroy its value for that purpose and greatly diminish its value for any purpose. At the time of the purchase there was in the rear of the building a large and well-arranged kitchen garden. This fact had much weight with the complainants. The contraction of the lot, by the true location of the western line, not only cut into the garden very seriously, but also made it necessary to locate the barn, which was necessary to Mrs. Murray's health, at a point which would still more cut into the garden, and also locate it so near the house as to make it undesirable. After this information came they were compelled to abandon their plans for the subdivision of the lot and the erection of a new building. They immediately called the information they had received to the attention of the defendant and demanded of him a rescission of the conveyance, offering to reconvey the property, and demanded the repayment of the $5,500 purchase money and interest. Defendant first insisted that his representations were correct, and caused a survey to be made for himself, which confirmed the survey made under the direction of the architect. Afterwards it is alleged that the defendant for some time evaded complainants' demands for a rescission of the transaction, but finally absolutely declined to do anything in that respect. Thereupon, about the 22d day of March, 1907, the complainants, through their attorneys, made formal demand upon him for a rescission of the transaction, and tendered to him a reconveyance of the property. Copy of the deed of reconveyance so tendered is attached to the bill. Complainants removed certain household furniture from Cleveland to Asheville and placed it in the house; but after they discovered the circumstances they removed the furniture, and have never at any time since used or occupied the premises. Complainants relied upon the friendship of the defendant in this transaction, and the defendant was fully advised of the object and purpose for which they purchased this property. Further allegations are then made as to the reliance by the complainants upon the integrity of the defendant and his friendly feeling and friendship for them. Then occurs the following statement in the bill: They aver that they believe, at the time the defendant made the representations as to the said location and dimensions of said lot, he believed them to be true, and that he was innocently mistaken as to the facts, although he may have been careless in his method of ascertaining such facts and assuming them to be correct; there having been ample opportunity during his long residence and occupancy of the property to become familiar with its true boundaries. The prayers are that the sale be rescinded and canceled, and that the defendant be adjudged and decreed to repay the complainants the purchase price paid him—that is, the sum of $5,500—with interest from the date of payment, November 20, 1906, and for a lien, enforced in such way as the court may direct, upon the property for the amount to be paid them as prayed. The foregoing are substantially the allegations of the bill.

In his answer, under oath, defendant admits that he was Mrs. Nellie Murray's physician, but denies that there existed between himself

and complainants any close personal and confidential relations, beyond professional duty inducing complainants to rely upon his representations as to the purchase of the property. He admits that he was consulted as to the advisability of Mrs. Nellie Murray taking up her residence in Asheville for the purpose of restoring her health, but denies that Asheville was the only health resort recommended by him. On the contrary, he says he advised complainants that there were a number of other suitable places in North Carolina and other states, a residence in any of which would be equally beneficial to Mrs. Murray, but specifically said that he did not wish to influence Mrs. Murray to take up residence in Asheville, merely giving the reasons why he believed the climate in Asheville would be conducive to her recovery; that it is not true, as alleged, that he offered objections to most, if not all, of the properties which Mr. and Mrs. Murray were considering as a home for Mrs. Murray. On the contrary, he gave them a long list of other homes. He admits, however, that he advised that some of the places complainants suggested were not suitable for the purpose. He did say that certain other property in Asheville would be suitable after adding out of door sleeping quarters, so that they would meet with the requirements of Mrs. Murray's condition, and were so located as to be healthful; that, before he took George E. Murray to see his own property on Pearson Drive, Murray had visited several places in Asheville and expressed dissatisfaction with all of them, and it was when Murray had seen these other properties and intimated that he did not want them that defendant took him to see his own property, which was subsequently bought; that it never was suggested to him that Mr. and Mrs. Murray would desire to use the property for any other purposes than as a home for Mrs. Murray; that defendant did say that the property on Pearson Drive, by reason of its location, its southern exposure, and the facilities it possessed for permitting Mrs. Murray to sleep out of doors, was suitable for the purpose. He denies that he ever represented to Mr. and Mrs. Murray that the west line of the lot began at a certain bush or sapling and ran practically north; that there was no sapling or bush there, and that he pointed out the footpath abutting on the northern margin of Pearson Drive as the beginning of the line between him and Mrs. Brown; that, at the time complainant and defendant went to see the property, defendant took the complainant all over the grounds, through the house and barn, but did not point out the lines as indicated by the fences, and defendant says he then and there gave an exact and correct description of the property; that it is not true, as alleged, that he claimed and represented that the true westerly line began on the northern margin of Pearson Drive; that it is true that he pointed out the fence lines around the property as being the lines which he believed to be correct, but that he stated to them that his deed for the property was the only instrument from which he could get an accurate description, and referred them to it for that purpose; that he was careful to point out that the small angle at the northeast corner of the lot between the survey stakes and the street belonged to the city. He expressly avers that complainants did not rely upon his representations and statements

in regard to the location and title of the property, but that complainants had the title fully examined and passed upon by competent attorneys, and during the time of examination had access to defendant's title papers, and also had the deed which he offered as a proper conveyance of the property, which deed contained a full and accurate description of the property by metes and bounds, and referred to the plat of the property duly recorded in the office of the register of deeds of Buncombe county, reference to which plat would have disclosed to complainants and their attorneys the exact location of the lot and the length of each of the boundary lines. It is true that defendant represented the lot as being 197 feet by 240 feet; but he did not at any time state that the property fronted 197 feet on Pearson Drive, and a reference to the deed executed by defendant and his wife to the complainants would have shown that they were mistaken in their belief that the lot fronted 197 feet on Pearson Drive. He admits that complainants did complete the purchase of the property, but denies that they completed it so far as he was concerned with any understanding that the property fronted 197 feet on Pearson Drive. Defendant does not know whether it would be practicable to subdivide the lot on account of its triangular shape, but does not believe it could be utilized for the purpose of two houses, even if the westerly line had been as indicated by the fence. He denies that it was ever suggested to him that complainants might desire to divide the lot. He says, when Mrs. Murray arrived in Asheville about the end of 1906, the property was not in such a condition as Mrs. Murray could occupy it, the condition having been brought about by the freezing and bursting of some water pipes in the house, but that defendant, at the request of Mr. Murray, had the repairs made, and the defendant paid for the same; that when Mrs. Murray saw the house in the condition it was in, although she had been in the house before, she became dissatisfied with it, and began to criticise and scold her husband for having purchased it; that Mr. Murray then stated that the defendant was not to blame for the condition of the house, and said that if Mrs. Murray was not satisfied with the property he would build another house elsewhere. He denies that the existence of the garden had much weight with complainants in inducing them to buy the property, as both Mr. and Mrs. Murray said to the defendant that the alley leading to the barn would not be used, but that they would cut a road through the garden to the barn, which would have almost totally destroyed the garden. He denies that to move the barn so as to place it entirely upon the line would have placed it so near the house as to make it objectionable. He denies that complainants, immediately after receiving the information as to the true location of the lines, made demand for a rescission and reconveyance of the property, or that he ever evaded such a demand. On the contrary, he says that complainants assumed control over the property with full knowledge of all the facts relative to its boundaries, and paid to the defendant, in accordance with their agreement to purchase, a proportionate amount which defendant had expended for taxes and insurance on the property, and thereafter listed the property with at least one real estate agent in Asheville for rent. He says their furniture was

stored in the house after they discovered their mistake with reference to the westerly line of the lot, and after they knew of the deficiency in the area of the lot. Defendant has no knowledge as to when the furniture was removed, or whether it has been removed. He has no recollection that he was ever notified that it was removed, or that the property was ready for occupancy by him, and denies that such notice was ever given. He denies again that defendants relied upon him in the purchase of the property, and alleges that they accepted the property and paid the purchase money only after they had made a full investigation through their attorneys. He alleges that they had the information at hand, and could have easily discovered the true location of the westerly line. He says that the only reliance complainants placed upon him was in so far as he advised them professionally that the property was suitable as a home for Mrs. Murray; that it was his opinion that the house was suitable for Mrs. Murray, and he still believes it to be suitable. He says that the mistake in reference to the line was on account of the complainants' own carelessness. He denies that there is as much as $2,000 involved in the controversy, because he says the most he could be held responsible for would be the difference between the value of the property if the westerly line was where the fence now stands, and this would not be anything like $2,000.

Evidence was taken, there has been a final hearing in the case, and, after argument, it has been submitted for determination. In order to correctly understand this case, it must first be stripped of all superfluous matter. Some evidence was offered by complainants tending to show that they were informed, after purchase, that the house had been occupied by persons afflicted with tuberculosis, rendering it unsuitable for Mrs. Murray's occupancy. There is no allegation whatever in the bill to this effect, and the testimony so offered was objected to by defendant's counsel as being inadmissible for that reason. The rule that the allegation made in the bill and the proof in support of it must correspond, and that no proof will be admitted in support of that which is not alleged, is so well settled that it hardly needs authority to support it; so that I think this matter may be entirely eliminated before coming to a consideration of the real question involved. It may also be said, as will be shown by a clear statement in the bill, that no fraud or deceit is claimed to have been practiced by the defendant in connection with the transaction. The matter of the frontage of the lot appears to have been waived, and not insisted upon now, so that the status of the case is, as was conceded on the hearing, that of a mutual mistake of the parties as to the western line of the lot.

That the defendant really believed the line to be where the fence and some shrubbery showed it to be was evidenced by the fact that he had built his barn so that the larger part of it was on the small strip or angle as to which the mistake is said to have been made. That complainants believed that to be the line is manifest, because the barn was on the line and the fence was running up along a considerable portion of the lot to a point about even with the back porch, thereby indicating to them, or to any one else not making a careful measurement, that this was the true line. It is perfectly clear from the evidence that the

only thing the defendant knew as to the purpose of the complainants with reference to the lot was that it was to be the temporary home of Mrs. Murray. There is nothing to show that he had any knowledge whatever that they had any thought or intention of dividing the property into two lots and building another house. If complainants had any such thought, they certainly did not communicate it to the defendant. If the fence had been upon what is now said to be the true line, and the barn had been within this line (the property being in other respects as it was), would this have been considered a material matter by the plaintiffs, and would it have prevented the trade; or, on the other hand, if this had been true, would Mr. and Mrs. Murray have been just as well satisfied as they were, and have purchased the property notwithstanding that fact? This is the proper way to look at the case in order to reach a correct conclusion as to what should now be done.

In Grymes v. Sanders et al., 93 U. S. 55, 23 L. Ed. 798, it is said in the opinion by Mr. Justice Swayne:

"A mistake as to a matter of fact, to warrant relief in equity, must be material, and the fact must be such that it animated and controlled the conduct of the party. It must go to the essence of the object in view, and not be merely incidental. The court must be satisfied that but for the mistake the complainant would not have assumed the obligation from which he seeks to be relieved. Kerr on Mistake & Fraud, 408; Trigg v. Read, 5 Humph. (Tenn.) 529 (42 Am. Dec. 447); Jennings v. Broughton, 17 Beav. 541; Thompson v. Jackson, 3 Rand. (Va.) 507 (15 Am. Dec. 721); Harrod's Heirs v. Cowan, Hardin (Ky.) 543; Hill v. Bush, 19 Ark. 522; Juzan v. Toulmin, 9 Ala. 662, 44 Am. Dec. 448."

In Story's Equity Jurisprudence, § 151, the doctrine is stated in this way:

"* * * Mistake or ignorance of facts in parties is a proper subject of relief only when it constitutes a material ingredient in the contract of the parties and disappoints their intention by a mutual error, or where it is inconsistent with good faith, and proceeds from a violation of the obligations which are imposed by law upon the conscience of either party. But where each party is equally innocent, and there is no concealment of facts which the other party has a right to know, and no surprise or imposition exists, the mistake or ignorance, whether mutual or unilateral, is treated as laying no foundation for equitable interference."

Section 856 of Pomeroy's Equity Jurisprudence, on this subject, is as follows:

"There are two requisites essential to the exercise of the equitable jurisdiction in giving any relief defensive or affirmative. The fact concerning which the mistake is made must be material to the transaction, affecting its substance, and not merely its incidents; and the mistake itself must be so important that it determines the conduct of the mistaken party or parties. If a mistake is made by one or both parties in reference to some fact which, though connected with the transaction, is merely incidental, and not a part of the very subject-matter, or essential to any of its terms, or if the complaining party fails to show that his conduct was in reality determined by it, in any case the mistake will not be ground for any relief affirmative or defensive."

From the foregoing authorities, and others which might be cited, it seems clear that a mistake, to justify equitable relief, must be as to a matter which was controlling in bringing about the transaction. The mistake should be as to something without which the trade would not

have been made. Mr. Murray bought this property as a home for his wife. They wished a pleasant, healthy location, a good residential street, and a house, in view of Dr. Paquin's recommendation, with a sleeping porch; and these were the main things they desired, and these they obtained. It does not appear anywhere in the record that defendant had any knowledge whatever that there was a proposition to subdivide or utilize the property as a paying investment. The main object, and the one which Mr. Murray and his wife had in mind, above all things, was a pleasant home and pleasant surroundings, and such a place generally as would render Mrs. Murray comfortable, and the occupancy of which would be conducive to Mrs. Murray's improvement in health and to her recovery.

But there is an additional reason against the complainants' right to relief in this case, and it grows out of the fact that the record shows that they had the same opportunity the defendant had for getting the true facts, but failed to avail themselves of the information which was readily at hand. They were furnished defendant's deed to the property and the chain of title for their examination. They placed the examination of the title in the hands of competent attorneys, and altogether could have known, just as well as the defendant could have known, everything about the lot and its proper and true boundaries. The authorities are uniform to the effect that, this being true, they are not entitled to relief in a court of equity.

In Crowder v. Langdon, 38 N. C. 486, the rule on this subject is stated in this way:

" * * * The general rule unquestionably is that an act done or a contract made under a mistake or ignorance of a material fact is relievable in equity. 1 Story, Equity, 155. But where the means of information are alike open to both parties, and when each is presumed to exercise his own judgment in regard to extrinsic matters, equity will not relieve. The policy of the law is to administer relief to the vigilant, and to put all parties to the exercise of a proper diligence. In like manner, where the fact is equally known to both parties, or where each has equal and adequate means of information, or when the fact is doubtful from its own nature, in any such case, if the party has acted with entire good faith, a court of equity will not interpose. 1 Fonb. Eq. bk. 1, c. 2, § 7, note "v"; 1 Pow. on Con. 200; 1 Mad. Ch. Pr. 62, 4; 1 Story, Eq. 163."

In Anderson v. Rainey, 100 N. C. 321, 5 S. E. 182, in the headnote it is said:

"If, in a contract for the purchase of land, a party fails to avail himself of those sources of information readily within his reach, and chooses to rely upon representations which, though not true, were not made with any false and fraudulent intent, the maxim of 'caveat emptor' applies, as it does to personal property, and courts will not aid the purchaser. Walsh v. Hall, 66 N. C. 233."

An extract from the opinion in Woodbury v. Evans, 122 N. C. 781, 30 S. E. 2, is as follows:

"This is an action to recover the balance due on a contract for the sale of land, and the court says: 'In all contracts for the sale of land it is the duty of the purchaser to guard himself against defects of title, quantity, incumbrance, and the like; and if he fail to do so it is his own folly, for the law will not afford him a remedy for the consequences of his own negligence. If, however, representations are made by the bargainor, which may be reasonably relied upon by the purchaser, and they constitute a material inducement to the contract, and are false within the knowledge of the party making them, and

cause loss and damage to the party relying upon them, and he has acted in ordinary prudence, in the matter, he is entitled to relief.' Etheridge v. Vernoy, 70 N. C. 713; Foy v. Haughton, 85 N. C. 168; Anderson v. Rainey, 100 N. C. 321, 5 S. E. 182."

In Farnsworth v. Duffner, 142 U. S. 48, 12 Sup. Ct. 165, 35 L. Ed. 931, in the opinion by Mr. Justice Brewer, the proper rule on this subject is stated in this language:

"This is a suit for the rescission of a contract of purchase, and to recover the moneys paid thereon, on the ground that it was induced by the false and fraudulent representations of the vendors. In respect to such an action it has been laid down by many authorities that, where the means of knowledge respecting the matters falsely represented are equally open to purchaser and vendor, the former is charged with knowledge of all that by the use of such means he could have ascertained. In Slaughter, Administrator, v. Gerson, 13 Wall. 379, 383, 20 L. Ed. 627, this court said: 'Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's misrepresentations. If having eyes, he will not see matters directly before them, where no concealment is made or attempted, he will not be entitled to favorable consideration when he complains that he has suffered from his own voluntary blindness, and been misled by overconfidence in the statements of another. And the same rule obtains when the complaining party does not rely upon the misrepresentations, but seeks from other quarters means of verification of the statements made, and acts upon the information thus obtained.' See, also, Southern Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678; Farrar v. Churchill, 135 U. S. 609, 10 Sup. Ct. 771, 34 L. Ed. 246. In Ludington v. Reinick, 7 W. Va. 273, it was held that 'a party seeking the rescission of a contract, on the ground of misrepresentations, must establish the same by clear and irrefragable evidence; and if it appears that he has resorted to the proper means of verification, so as to show that he in fact relied upon his own inquiries, or if the means of investigation and verification were at hand, and his attention drawn to them, relief will be denied.' In the case of Atwood v. Small, decided by the House of Lords and reported in 6 Cl. & Finn. 232, 233, it is held that 'if a purchaser, choosing to judge for himself, does not avail himself of the knowledge or the means of knowledge open to him or to his agents, he cannot be heard to say that he was deceived by the vendor's representations.' And in Pomeroy's Equity Jurisprudence, § 892, it is declared that a party is not justified in relying upon representations made to him * * * '(1) when, before entering into the contract or other transaction, he actually resorts to the proper means of ascertaining the truth and verifying the statement; (2) when, having the opportunity of making such examination, he is charged with the knowledge he necessarily would have obtained if he had prosecuted it with diligence; (3) when the representation is concerning generalities equally within the knowledge or the means of acquiring knowledge possessed by both parties.' "

In Shappirio v. Goldberg, 192 U. S. 232, 24 Sup. Ct. 259, 48 L. Ed. 419, in the opinion by Mr. Justice Day, this is said on this subject:

"When the means of knowledge are open and at hand, or furnished to the purchaser or his agent, and no effort is made to prevent the party from using them, and especially where the purchaser undertakes examination for himself, he will not be heard to say that he has been deceived to his injury by the misrepresentations of the vendor. Slaughter, Adm'r, v. Gerson, 13 Wall. 379, 20 L. Ed. 627; Southern Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678; Farrar v. Churchill, 135 U. S. 609, 10 Sup. Ct. 771, 34 L. Ed. 246; Farnsworth v. Duffner, 142 U. S. 43, 12 Sup. Ct. 164, 35 L. Ed. 931."

What is now said to be the truth about this strip of land was not known to either party at the time of the sale. It could have been ascertained by the defendant by a careful examination of the deeds and

a simple measurement of the lot. The complainant, Murray, could have ascertained it in exactly the same way, and had the same opportunity for doing so. It was a mutual mistake—an honest mistake; both parties being in ignorance, and both having the same opportunity for ascertaining the truth.

What has been stated would seem to be sufficient to show that complainants are not entitled to relief in a court of equity. In addition to this it may be stated that, after Mr. and Mrs. Murray came to Asheville and saw the place, they moved their furniture into it, although it is probably true that they soon moved it out; but they did list the property for rent with a real estate agent in Asheville, but when the agent obtained a tenant Mrs. Murray declined to execute a lease. Whether this, in the absence of other controlling reasons, would be sufficient to deny relief, it is unnecessary to determine, because what has been heretofore stated must control the case against the complainants, and requires a denial to them of the relief sought by the bill.

Another matter has impressed me ever since the facts of the case, were presented, and that is: Why it was that both the defendant and complainants, after they bought the property, so readily yielded this strip of land under all the circumstances. Perhaps it would be unwise and improper to express any opinion now as to the relative rights of the parties here, and others, in this respect; but, if this strip could have been legally retained by the complainants as between them and the adjoining owner, there would certainly be no ground for relief here, whatever else might be true in the case. It seems to be conceded, however, by counsel for both complainants and defendant, that this strip must be yielded to the adjoining owner.

In view of this, I am inclined to think that it would be equitable for the defendant to pay the expense of removing the barn within what they seem to be willing to recognize as the true line. What this cost would be is a matter of conjecture, and I will hear counsel as to this; the costs to be equally divided.