TRENCHARD et al. v. KELL.

(Circuit Court, E. D. North Carolina. January 30, 1904.)

1. VENDOR AND PURCHASER—MISREPRESENTATION BY VENDOR—RIGHT OF PUR-
CHASER TO RELIEF IN EQUITY.

   Defendant gave a written option on property owned by him, consisting
   of a railroad, sawmills, and timber lands, the value of the railroad and
   mills being largely dependent on the quantity of timber on the lands,
   which was stated in the option to be "not less than 35,000,000 feet. A
   representative of complainants, who contemplated buying the option and
   the property thereunder, was sent to inspect the timber, and by direction of
   defendant went to an agent of his, who pointed out the boundaries.
   Complainants purchased the option and the property in reliance on the
   statement in the option and the report of their representative. In fact,
   the boundaries shown by defendant's agent included land not owned by
   him, and there was only about 8,500,000 feet of timber on the land actually
   conveyed, and both defendant and his agent knew there was not the
   quantity represented. Held, that the doctrine of caveat emptor did not
   apply, since there was an express warranty and actual and positive fraud
   on the part of defendant, and that complainants were entitled in equity
   to set off against notes given for unpaid purchase money the difference
   between the value of the property had there been the quantity of timber
   represented and its actual value.

In Equity.

W. H. Day, Peebles & Harris, Gay & Midyett, and Shepherd &
Shepherd, for complainants.

F. H. Busbee, Hughes & Little, and Walter Daniel, for defendant.

PURNELL, District Judge. Complainants commenced a civil ac-
tion in the state court August 8, 1902, which, on petition of defendant,
was removed to this court. Complainants afterwards moved to re-
mand to the state court, which motion, after argument by counsel, was
overruled, and order to remand refused, and the cause sent to a special
master to take depositions. The report being filed, the cause was
set down for hearing and heard. The record is unnecessarily volumin-
ous, and much in it not pertinent to the questions at issue. The fol-
lowing facts appear from the pleadings:

In April, 1901, the defendant, Kell, being the owner of certain prop-
erty described in Exhibit A of the complaint, gave an option on the
same to B. E. Oberndoffer, the terms of which are set out in said
exhibit. On July 5, 1901, the said option was extended for 30 days
from July 4th, and on the 31st of July, 1901, was modified. The
property consisted of a railroad, rolling stock, etc., saw and planing
mills, horses, buildings, a stock of goods and lands; "also all standing
timber in Northampton county, North Carolina, owned by the said F.
Kell, which consist of not less [than] thirty-five million feet." On
July 31, 1901, the complainants purchased the modified option of
Oberndoffer. The modification related chiefly to the terms of payment,
and provided "that separate deeds of trust may be given on the rail-
road and the mill timber should the purchaser desire it." The defend-
ant, Kell, was present. Before purchasing the option, and before pur-
chasing under it from Kell, the complainants sent Pringle, a man of
experience, to make an estimate of the standing timber. Kell referred

complainants, and also Pringle, to one W. H. Vaughn, who was then in his employment, who, as Kell's "timber man," would show Pringle the timber trees; Vaughn being familiar with them. Vaughn, as the agent of Kell, went with Pringle, and showed him a large lot of timber trees, which he (Vaughn) said belonged to Kell. Pringle, relying on the statements of Vaughn, estimated the timber trees belonging to Kell as amounting to between thirty-three and thirty-five million feet, and so reported to complainants. Complainants allege that, trusting to the statements in Exhibit A, signed by said Kell, that he had not less than 35,000,000 feet of timber trees, and to the statements made by his agent, Vaughn, to Pringle, which statements were a material inducement to the contract (the railroad, mills, and other property being of little value without such large quantity of timber trees), the complainants, on August 13, 1901, purchased the property at the price of $60,-000, paying $20,000 cash, and executing two notes of $20,000 each for the balance of the purchase money, which notes are secured by deeds of trust. While separate deeds of trust were made for different parts of the property, the purchase of the whole was one transaction, and the chief value of the railroad consisted in the fact that it was used to haul logs to the sawmill at Gumberry, and the procuring of the large quantity of timber trees shown to complainants' agent, Pringle, by Kell's agent, Vaughn. This complainants allege was the leading inducement to the purchase of the property, but for which the purchase would not have been made. Complainants immediately took possession of the property and retained possession until the receiver was appointed. After the purchase, and after complainants had made improvements, which were needed to put the plant in good condition, they learned that a large number of the timber trees pointed out to complainants by Vaughn as belonging to Kell did not in fact belong to him, and thereupon they employed Pringle to make an estimate of the timber trees actually owned by Kell, and he found that the trees actually owned by Kell was only 8,252,100 feet, and the timber trees lying between the road from Jackson to Lasker via Boones X Roads and Rehoboth, and from Lasker to Jackson via Henry T. Boone's, as shown on the map filed and used in the argument, and represented by Kell, through his agent, Vaughn, to complainants' agent as the property of Kell, but which in fact was not his property, amounted to 11,635,200 feet, and the timber trees situated outside of said area, which was represented by Vaughn as Kell's property, amounted to 12,550,400 feet. Complainants allege that the representations of Kell in Exhibit A and his representations through his agent, Vaughn, were false and fraudulent, and they were relied upon by the complainants, and induced them to make the purchase. Before complainants discovered the fraud, they had made improvements on the property to the extent of $7,500. That said timber trees so fraudulently represented to be the property of Kell were worth $2 per 1,000 feet standing in the woods, amounting in the aggregate to $48,000, and complainants allege they were damaged in that sum. They pray the two outstanding notes be surrendered and canceled, and they are entitled to $48,000, the difference between said notes and the value of said 24,000,000 feet of timber trees falsely

and fraudulently represented to be the property of the said Kell. They ask for other and further relief.

The answer admits the option and its modification; that complainants sent Pringle to estimate the quantity, and that Vaughn went with him, and pointed out the timber belonging to Kell. It is alleged upon information and belief Vaughn pointed out the timber correctly. It admits Vaughn did point out timber not belonging to Kell, but avers he stated that it was the timber of others, and could probably be bought. It denies that Kell at Gumberry referred Pringle to Vaughn. The answer also denies any fraudulent purpose or intent, and it also denies the representation as to quantity was a material inducement to the purchase. The answer further states that Kell furnished the complainants, or their agent, with the title deeds, and they had opportunity to examine. The answer also denies that the railroad was chiefly valuable on account of the timber, but admits, although there were separate deeds of trust, the whole was one transaction. It alleges much timber was cut by complainants after the sale and before the commencement of this action. It alleges that at the time of signing the modified agreement Kell declared he would not guaranty the amount of timber. It denies that valuable improvements were put upon the property. It sets up a counterclaim on the two outstanding notes, and prays for foreclosure.

Upon the issues as thus raised, some of which are immaterial, the court finds the facts as hereinafter set forth from the record and the evidence.

Vaughn pointed out the territory lying between certain roads, and stated all the timber within these lines belonged to Kell. This was in June, and at that time both Kell and Vaughn represented that there was at least 35,000,000 feet of timber owned by Kell. Vaughn said Kell claimed 40,000,000 feet, but he did not think there was that much timber. Vaughn was sent by Kell to point out all the timber owned by Kell. This examination lasted two days. The answer admits Vaughn pointed out timber on lands not owned by Kell, but denies he said they were Kell's. It is to be observed the representation as to quantity is repeated in the modified option the day it was purchased by and assigned to complainants. It is true that Kell testified that he did not know what was in the option when he signed it, but in this he is contradicted. The terms were fully discussed, changes agreed to, and the option rewritten from memorandums furnished by Kell. He knew the terms of the modified option, furnished the memorandum from which it was drawn, had a copy of it when it was discussed, and read it, or could have done so, before signing it. When at the meeting at Norfolk, where the parties were all present, Kell was asked if he would warrant or guaranty 35,000,000 feet of timber. He replied, "I stand by my option." There is some conflict as to what else he said. Vaughn was the agent of the defendant, Kell, in showing and pointing out this timber to Trenchard and Pringle. After taking Pringle over the territory described, and pointing out the timber as Kell's, all of which Vaughn said was Kell's, Pringle made the report of 32,000,000 feet upon the representations of Vaughn as to the timber pointed out by him as the property of Kell. He had no deeds, and was not in-

structed to inquire into the title. The complainants were induced to purchase the option, and afterwards the property, by statements in the option, the report of Pringle based thereon, and the representations made by Vaughn. This was a material inducement to the purchase. Soon after the property was placed in the hands of a receiver, the timber was exhausted, and other timber purchased to keep the plant a going concern. Pringle's report shows on land within the boundaries pointed out by Vaughn 11,635,200 feet. There was only about 8,500,-000 feet on the land which belonged to Kell. There was manufactured at the mill to May 1, 1903, according to the books, 8,967,662 feet. Total number of feet of lumber manufactured by W. & T. L. Co. from the time it began to do business to May 1, 1903, amounts 9,106,075, including timber bought from other parties than F. Kell, and also all timber manufactured out of that bought of Kell. Amount of timber gotten from Kell 8,500,000 feet. There is evidence that both Kell and Vaughn knew they were making false representations as to the quantity of timber. A previous option had been canceled on this account. The value of standing timber at time of purchase was $1.50 per 1,000 feet, located along or near the railroad track or the extensions thereof. The controversy must be determined on the value of the property, timber, etc., at the time of the purchase or contract of purchase. The sawmill plant, houses, land, etc., would be of much less value to purchasers with only 8,500,000 of timber than with an ample supply of timber. With timber, the plant, including houses, buildings, etc., together with improvements, would be worth $15,000. Without timber it would not be worth over $8,000. The shares of the railroad were $100 per share par value, and the capital stock of the railroad was $25,000. With the timber gone, sawmill plant would have no value, except for sale as secondhand machinery and lumber, the railroad would not pay operating expenses, and the other improvements be of little value. Vaughn is a man of bad character.

The court finds the foregoing as the facts, and the only facts, necessary to a determination of the questions at issue. It must be borne in mind this is a court of conscience, and the defendant has selected this tribunal by his petition on removal, which seems to be lost sight of in the briefs and in the argument, where the rule contended for and the authorities cited are mostly in cases at law. Courts of equity, while they follow the law, were established to relieve the harshness of the rules of law and furnish remedies and relief where the law gave none. Attorneys practicing under the Code system are frequently inadvertent to the fact that there is a broad distinction between actions at law and suits in equity, which under the Code practice is expressly abolished, but is maintained in the courts of the United States. The line of demarcation is as well defined, as said by the Supreme Court of the United States, "as though marked by monuments visible to the naked eye." Complainants were nonresidents. They wished to invest in the rich timber forests of this state, and came South for this purpose. They found property upon which there was an option represented to contain "not less than thirty-five million feet of standing timber." It is unnecessary to discuss the chaffering prior to the purchase, because the representations as to the quantity were in writing,

and such representations were made to the purchaser by the vendor as well as by his agent, Vaughn. It was signed with a virtual guaranty of "not less than thirty-five million feet." Parol testimony as to what others say or what others said cannot change this fact or modify it. Defendant has objected to testimony tending to do so, and his objections sustained. It was a representation which admits of no contradiction, but the paper writing speaks for itself. Complainants were trading with the owners of the property, and at the last moment one of them asked the vendor as to guarantying the quantity, when he referred to his option containing this representation, and by signing it verified what he said, "I stand by my option." There is much conflict of testimony as to the estimates of the standing timber. Vaughn said Kell claimed 40,000,000 feet, but he did not think there was over 28,-000,000 feet. Others—among them Pringle—sent out for the purpose of estimating the quantity made less than Kell claimed; at one time 32,000,000, at another less. Complainants had notice of all this, besides having had it pointed out to them, though they did not stalk the timber. If Kell owned all the timber within the boundaries pointed out by Vaughn, the man designated by Kell for this purpose, then all the estimates were too low. The option was only extended 30 days, too short a time within which to have run the lines of the different tracts, examine the title, and estimate the standing timber. Kell was probably anxious to sell. With what had been pointed out to them, complainants, possibly anxious to buy, not to lose a bargain, hence relied on Kell's estimate as to stumpage, and whatever he might have said, in the last moment, immediately before the contract was entered into. Kell, by the written option, represented that there was 35,000,000 feet of standing timber. Complainants were dealing with Kell, not with other parties. They had a right to rely on the written contract, and from all the surrounding circumstances they seem to have done so. In the conversation in the meeting in Norfolk there is some conflict of testimony as to what Kell said as to the quantity of timber guarantied. The purchaser, or one of them, who made the inquiry, had his mind intent on the answer. He and his associates were buying; most interested of any in the meeting. As to this very question his mind was intent on the inquiry. Somewhat confused, probably, by the different estimates, he made inquiry for a purpose. He preferred to rely on what the party said with whom he was dealing. Kell probably looked and acted like an honest man. Without any reason to doubt his fairness, and in the last moment, he (Kell) said, "I stand by my option." Being thus intent and greatly interested, the purchaser caught the reply more distinctly, and his testimony is more to be relied on than that of parties interested in other matters—Oberndoffer in selling his option, the lawyer in earning his fee, etc. "I stand by my option." How? In what respect? To a reasonable mind this expression in answer to the question asked referred to but one thing—the quantity of standing timber on the land. The vendees had no reason to suspect Kell was driving a sharp bargain, deceiving them, or carrying out the perversion of the Scriptures into a mandate so often practiced by vendors of standing timber, "meet a stranger and take him in." The written contract must stand, and it is familiar learning to all that

parol testimony to vary the terms of a written contract cannot be heard; hence testimony tending to vary or modify the written contract has not been considered, and is incompetent for this purpose. Objections to such testimony, without specifying them, are sustained, and the party introducing it will be taxed with the cost of such testimony.

If the purchasers knew of the different estimates of standing timber, as contended by defendant, it appears, also, that the defendant himself knew of the lower estimates, and sold and assigned the option representing the quantity to be as stated therein. The rule contended for by defendant that "fraud is never presumed; and where it is alleged the facts sustaining it must be clearly made out. The representation must be in regard to a material fact, must be false, and must be acted upon by the other party in ignorance of its falsity, and with a reasonable belief that it is true. It must be the very ground on which the transaction took place, although it is not necessary that it should have been the sole cause, if it were proximate, immediate, and material. If the purchaser investigates for himself, and nothing is done to prevent his investigation from being as full as he chooses, he cannot say that he relied on the vendor's representations" (Southern Dev. Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678; Farrar y. Churchill, 135 U. S. 609–615, 10 Sup. Ct. 771, 34 L. Ed. 246; Farnsworth v. Duffner, 142 U. S. 43, 12 Sup. Ct. 164, 35 L. Ed. 931)—is more aptly stated in the last authority cited than the one quoted as above. In this the distinction is made that the purchaser must have not only made investigations, but relied on evidence they furnished, and not upon the representations of the vendor. The opportunity to investigate does not deprive the purchaser of the application of this rule, or deprive him of the right to relief where there is actual fraud or he elects to rely on the representations of the vendor. Or, to state the rule conversely, he must not have relied on the representations of the vendor, but on his own judgment. In an action for tort for a breach of an express warranty, to which was joined a declaration in deceit in the same cause of action, the warranty is the gist of the action, and it is not necessary to prove a scienter. Shippen v. Bowen, 122 U. S. 575, 7 Sup. Ct. 1283, 30 L. Ed. 1172. The option contained a warranty of not less than 35,000,000 feet of standing timber. This is the gist of the suit.

But complainants, in their pleadings, which were filed in the state court, couple with this a suit for fraud and deceit, which is not inconsistent in the state practice nor in this court. This is a contributing inducement to the main cause. The false representation or the suppression of facts in the knowledge of the defendant, which in fairness should have been communicated to the complainants, that the quantity of timber which had caused a former option to be canceled, was such fraud and deceit tending to induce complainants to purchase as would entitle them to relief were there nothing else in the record. Knowing this fact, and leaving a contemplating purchaser to grope about, exercise his own judgment, is not a transaction which a court of equity can sustain or sanction, but from which such court will give relief. This shows actual knowledge on the part of Kell that the 35,000,000 feet of timber was not on the land. "In a court of conscience deliberate concealment is equivalent to deliberate falsehood." "Concealment is

indicative of fraud." Crosby v. Buchanan, 23 Wall. 420, 23 L. Ed. 138.

The doctrine of caveat emptor, vigorously pressed by defendant in the argument, does not apply where there is actual fraud and an express warranty. Hill v. Brower, 76 N. C. 125. The rule applies only in the absence of actual fraud. 1 Big. on Fraud, 528. And it is more a rule of law than equity. At law fraud must be proved; in equity it may be inferred from surrounding circumstances. "In a court of equity no man can complain that another has too implicitly relied on the truth of what he has himself stated." Fetter's Eq. 136.

There was no argument of objections to testimony appearing in the depositions, but counsel handed to the court a memorandum of objections noted, on which they insist, and ask a ruling of the court. This is unusual practice, but to give defendant the full benefit of exceptions the court overrules the objections as noted in the memorandum filed. An examination of the depositions will show the bulk of the testimony to which objections are overruled is not considered in the decision, but treated as immaterial. Other objections noted in the memorandum filed sustained.

Complainants are entitled to relief, and the defendant is also entitled to affirmative relief. The true measure of damage to which complainants are entitled is the difference between the real value of what they purchased and of that which they received under the contract. It is the loss which they have sustained, and not the profits which they might have made by the transaction. It excludes speculation, and is limited to compensation. Sigafus v. Porter, 179 U. S. 116, 21 Sup. Ct. 34, 45 L. Ed. 113; Rockefeller v. Merritt, 76 Fed. 909, 22 C. C. A. 608, 40 U. S. App. 666–674. An adjustment of the equities.

The depositions were taken under equity rule 67, and the cause set down for hearing at the suggestion of counsel. The cause should have gone to a special master to hear the evidence and find the facts, but after argument the court did not feel justified in thus referring it. The labor of examining a voluminous record has been thus undertaken when other duties demanded attention, and a decision delayed. The court was entitled to the aid of a special master, the standing master being of counsel.

Complainants will be charged with the real value of the property at the time of the purchase, less the difference in standing timber as represented in the option and that actually found to be upon the land, and a reasonable rental for the use of the property from the date of purchase until the same was placed in the hands of the receiver, or, there being no satisfactory evidence as to what is a reasonable rental, legal interest at the rate of 6 per cent. on the balance, and will be credited with the amount paid as a part of the purchase money, the amount paid for the option, $8,500, it being an amount in excess of the price fixed by Kell upon the entire property on a basis of 35,000,000 feet of standing timber which complainants were compelled to pay to remove a cloud upon the title, thus increasing the price of the property this amount; and they are therefore entitled to have this amount added to the price fixed by Kell.

In case of foreclosure or sale under the deeds of trust, complainants would be entitled to a further credit of $7,500 for betterments placed

on the property. The property is enhanced to that amount. If the balance of the purchase money is paid, they would not be entitled to this credit, because these betterments were put on their property.

Applying the rule as adopted, complainants will be charged as follows: Railroad, $12,500; mill, land, etc., $15,000; timber, eight and one-half million feet at $1.50 per thousand, $12,750; interest on $11,750, balance on amount found due in lieu of rent, $705—total, $40,955; and also credited with the following amounts: Cash paid on purchase, $20,000; amount paid for option, $8,500—total $28,500; leaving a balance of $12,455. The outstanding notes given for the purchase money will be abated, credited, and reduced accordingly. If this amount of $12,455 found to be due defendant shall be paid or tendered within 60 days of the entering of the decree as herein provided for, together with such cost as complainants shall be adjudged to pay, then the notes herein referred to, together with the deeds of trust securing the same, shall be surrendered into the registry of the court for cancellation. Should said amount of $12,455 be not paid or tendered as hereinbefore provided, then and in that event a decree will be entered in accordance herewith for the foreclosure of said deeds of trust according to the terms thereof and the decree of this court.

The costs will be adjusted, and taxed as provided for herein and in the formal decree.