KING et ux. v. LAMBORN et al.

(Circuit Court of Appeals, Ninth Circuit.    March 10, 1911.)

No. 1,913.

1. VENDOR AND PURCHASER (§ 33*)—VALIDITY OF CONTRACT—FRAUDULENT REPRESENTATIONS.

To entitle a purchaser of land to a rescission on the ground of fraudulent representations, they must be clearly and satisfactorily established, must have been material, and have been relied on, constituting the very ground on which the transaction took place.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 40-44; Dec. Dig. § 33.*]

2. VENDOR AND PURCHASER (§ 33*)—VALIDITY OF CONTRACT—FRAUDULENT REPRESENTATIONS.

To invalidate a contract for the purchase of land on the ground of false representations, it is not always essential that the party making them knew them to be false, but it is sufficient if he made them without knowing whether they were true or false.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 40-44; Dec. Dig. § 33.*]

3. VENDOR AND PURCHASER (§ 33*)—VALIDITY OF CONTRACT—FALSE REPRESENTATIONS—RIGHT TO RELY ON REPRESENTATIONS.

A purchaser cannot disaffirm a contract for the purchase of land on the ground that it was induced by false representations made by the other party, if he had the means of ascertaining the truth readily at hand, whether or not he made use of any such means.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 40-44; Dec. Dig. § 33.*]

4. VENDOR AND PURCHASER (§ 108*)—RIGHT OF PURCHASER TO RESCIND—FRAUDULENT REPRESENTATIONS—INVALIDITY OF CONTRACT.

Misrepresentation by a vendor as to material facts by which a purchase of property is intentionally induced amounts to a fraud which vitiates the contract, and entitles the purchaser to rescind, even though he may have sustained no pecuniary loss.

[Ed. Note.—For other cases, see Vendor and Purchaser, Dec. Dig. § 108.*]

5. VENDOR AND PURCHASER (§ 36*)—CANCELLATION OF INSTRUMENTS (§ 55*)—RIGHT OF PURCHASER TO RESCIND—FALSE REPRESENTATIONS.

A complainant who was induced to purchase an interest in land containing a coal mine owned by defendant by false representations as to the quantity of coal which had been taken from the mine within the past year, which, it was stated, had all been marketed locally, there being no facilities for shipping, whereas, in fact, not more than a third of such quantity had been mined, and there was not market for more, was entitled to a rescission of the contract in equity, although his co-complainant, who acted as agent for defendant in making the sale to him and who also purchased a separate interest at the same time, was a party to the fraud, or presumably cognizant of the true facts, and was not entitled to relief.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 52, 53; Dec. Dig. § 36;* Cancellation of Instruments, Dec. Dig. § 55.*]

6. WORDS AND PHRASES—"DAMNUM"—"INJURIA."

There is a distinction between "damnum" and "injuria." The former means only harm, hurt, loss, damage; while the latter comes from "in," against, and "jus," right, and means something done against the right of

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the party, producing damage, and has no reference to the fact of the amount of damage.

[For other definitions, see Words and Phrases, vol. 2, pp. 1823, 1824; vol. 4, p. 3614.]

Appeal from the Circuit Court of the United States for the Southern Division of the District of Idaho.

Suit in equity by Arthur H. Lamborn and John G. Richards against Harry G. King and Maria J. King, his wife. Decree for complainants, and defendants appeal. Reversed as to complainant Richards, and affirmed as to complainant Lamborn.

Clark & Budge, for appellants.
J. H. Richards and Oliver O. Haga, for appellees.

Before GILBERT and MORROW, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge. Appellant Harry G. King purchased in September, 1907, from one F. M. Pollard a coal mine comprising 480 acres of land, at a price of $30,000, situated from two to three miles from Salmon City, in Idaho. The defendant Richards was at the time living in Salmon City, and an intimate friend and acquaintance of King. At the suggestion of King, they visited the mine and inspected the tunnel and room in which Pollard had been extracting coal, known as the "Pollard Workings." Richards became fairly familiar with the conditions of the mine, but without making any scientific investigation of the quality of the coal found therein. Then and thereafter they discussed with each other the possibility of selling the mine, King wanting Richards to sell it for him. Tentatively they fixed the selling price at $75,000, and Richards was to receive $25,000 for his services. No definite agreement was arrived at, however, until Richards had gone to Winfield, Kan., when the parties entered into a written contract whereby King gave to Richards an option to purchase the mine, including the lands, at the price of $80,000; it being understood between them, aside from the agreement, that, if Richards succeeded in making a sale at that figure, he should receive $30,000 as his compensation. A correspondence continued between them, Richards suggesting and insisting that they would be more successful in the end if he would sell a one-half interest only at first, and later the balance, and, further, he was of the opinion he could do better if he himself would pretend to take an interest while negotiating the sale. Such was clearly the idea and purpose of Richards in pursuing his endeavor to dispose of the mine. In evidence of this he wrote to King January 23, 1908:

"Am offering one half interest and supposed to be taking care of the other half with you. Of course, I must be supposed to be putting in some money myself."

Again on March 12, 1908, he wrote:

"Of course, I am selling only a one half, but I desire to represent that I am investing some too so that a contract for the whole is necessary."

And still later wrote, to wit, June 13, 1908:

"I am trying on a basis of $40,000 for the ½ interest representing that I am buying the ¼ which we can fix up all right between us."

Richards personally had some acquaintance with Lamborn, meeting him while traveling. They became quite friendly, and discussed somewhat possible investments if opportunity should arise. After procuring the contract from King, Richards went to New York, the home of Lamborn, with a view of selling him an interest in the mine. Lamborn became favorably impressed with the project, and was induced to make a trip from New York to Salmon City for closing the negotiations. While in Ohio, either at Bethel or Cincinnati, and on his way to New York, Richards received a letter from King, telling him, among other things, that he had supplied about 2,000 tons of coal to the local market. The letter having been lost, the contents were testified to, but it was shown to Lamborn in New York, and during the time of Richards' discussion with Lamborn respecting the sale to him of an interest in the mine. Richards, at the request of Lamborn, telegraphed to King from New York for a statement from him respecting the tonnage of coal produced by King, to which he received King's reply, "2,300 tons." Lamborn testified relative to the letter that it stated in a general way that the output had been 2,300 tons during the period from the previous September up to the time the letter was written, namely, April or May. As to the telegram, he says the reply came back that the product was 2,300 tons; the same being received either the 10th, 11th, or 12th of June. Richards says the reason for Lamborn's wanting the information was that "he was considering becoming a partner with me in taking over this property." Richards returned to Salmon City, and Lamborn came out later, arriving the latter part of July, 1908. Richards and Lamborn visited the mine three different times, but were unable to get far into it because of bad air. A new tunnel had been driven since the purchase by King from Pollard, and the Pollard entry was practically obstructed by a caving of the wall or ceiling, so that it could not be conveniently entered. King, while he was working the mine, carried the old tunnel beyond the Pollard workings some distance, and the coal produced for the market previous to the negotiations with Lamborn was from the workings, which locality is subsequently spoken of as the "Old Room." After different conferences between King, Richards, and Lamborn, an agreement was arrived at for the sale by King to Lamborn and Richards of a three-fourths interest in the mine. This was later, on July 30, 1908, reduced to writing, and is in purport as follows: King agreed to convey the mine, including the 480 acres of land, to the Idaho Coal & Land Company, Limited, a corporation to be subsequently organized, in consideration of which Richards and Lamborn agreed to pay King $7,500 in cash, the further sum of $22,500 on or before January 1, 1909, and Lamborn to execute to King in addition four promissory notes for $2,500 each, payable, respectively, January 1, 1910, 1911, 1912, and 1913, making a total consideration of $40,000. It was further agreed that when the corporation was formed, which was to be capitalized at

$200,000, King should have one-fourth of the stock, Richards one-fourth, and Lamborn one-half. The mine was then to be bonded for $80,000, and from these King was to receive $40,000, and Richards and Lamborn the remainder; the contract stating $7,500 to Richards and $32,500 to Lamborn. At the time of closing the contract, however, Lamborn paid King by check $5,000, Richards paid him $1,000, and gave him his notes, two in number, aggregating $1,500. On or about January 1, 1909, Lamborn paid to King the further sum of $15,000, and Richards delivered to King his three promissory notes for $2,500, each payable in six months from January 1st, and according to the agreement Lamborn executed and delivered to King the four notes specified in the contract aggregating $10,000. Richards and Lamborn entered into possession of the mine, and continued to work it until in January, 1909, when Richards claimed to have ascertained that King had misrepresented certain facts which induced himself and Lamborn to purchase, and in March following they concluded on account of such misrepresentations and fraud to rescind the contract in toto. Accordingly in June following this suit was instituted for that purpose. The complaint, after setting forth the agreement and payments made and obligations executed in pursuance thereof, alleges as ground of fraud for rescission, among other things:

"That the said defendant stated and represented that the entire breast of what was known and designated as the 'old room' in the workings and excavations on said property was clean coal, and did not require any sorting, and was the same strata as the upper strata then exposed at the breast of the new entry, when in truth and in fact at the time of making the above-mentioned statements and representations the said defendant Harry G. King knew the same, and each of them, to be false and untrue. * * * The defendant Harry G. King fraudulently and falsely stated and represented to your orators, and each of them, that during the 11 months immediately preceding the making of such contract, 'Exhibit A,' that the said defendant Harry G. King, in developing such property and in extracting coal therefrom, had mined 2,300 tons of coal from such property, and had sold that amount of coal to consumers residing in and around the said town of Salmon City, and that, had he (the said Harry G. King) not been prevented from soliciting orders personally by reason of his banking and other business, he could have mined therefrom and sold in said community 3,000 tons of coal during such time. * * * The said defendant Harry G. King falsely and fraudulently stated that he had mined and sold from such premises during the time above mentioned 300 tons of coal to the Copper Queen mine, when, in truth and in fact, the said Harry G. King at the time of making such statements and representations knew the same to be false and untrue, and knew that the said defendant had not during the said time mined or extracted from the said premises or sold to consumers to exceed 700 tons of coal, and that the defendant during such time had not mined from said premises for or sold to the said Copper Queen mine to exceed 25 tons of coal. And your orators were greatly deceived and injured by such false and untrue statements; and the said premises and property are practically of no value whatever."

The plaintiffs prevailed in the Circuit Court, and the defendants are appellants herein. In support of the suit, the plaintiffs, appellees here, base their right of relief upon three specific representations alleged to have been made by King, claimed to be false and fraudulent within the knowledge of King, and made for the purpose of deceiving

and misleading Richards and Lamborn, and inducing them to enter into the agreement to purchase, namely:

"(1) That the entire breast of what was known as the 'old room' in the workings of the property included in such contract contained more than five feet of clean coal that would not require sorting.

"(2) That during the 11 months immediately preceding the making of such contract the appellant Harry G. King had extracted and sold from such property more than 2,300 tons of coal to the people around Salmon City.

"(3) That during the same time he had also mined from such property and sold to the Copper Queen mine 300 tons of coal."

The appellants deny that the representations were made or that they were designed to mislead or deceive the appellees, or that they were so induced to enter into the agreement.

As it relates to all these specifications of misrepresentation and fraud, it is not at all probable that Richards was either deceived or misled by any of them to his injury in any respect. He had been in the mine prior to any negotiations looking toward a sale, and had seen the Pollard workings, and was otherwise familiar with its product from whatsoever point it was obtained. But beyond this he and King were on the most familiar terms, and he was King's confidential agent in disposing of the mine. Their correspondence alone shows this, and the oral testimony adduced herein is strongly corroborative of the relationship. Indeed, it is satisfactorily shown in connection with the negotiations for this particular sale. Richards says in his letter from New York to King, while then trying to sell the property to Lamborn, "I am * * * representing that I am buying the ¾th which we can fix up all right between us." Six days later, to wit, on June 19, 1908, he, at the instance of Lamborn, telegraphed an inquiry as to whether King would accept certain definite terms for a sale of a three-fourths interest in the mine, but on the next day wired to King suggesting the answer he should make to the telegram, in words as follows: "Impossible to accept terms, wish you would come on here." King answered as suggested. Following this correspondence, Richards preceded Lamborn to Salmon City some time, and had ample opportunity to discuss fully all the features of the proposed transaction before the latter arrived. If Richards was not in reality a party to all these alleged false representations, he was so intimately related to King that he can scarcely be heard to deny knowledge, or deny that they were made with his assent. Manifestly he has not come into court with clean hands such as will entitle him to relief in equity. If there was intrigue attending the transaction, he was at least presumably a party to it.

We are to inquire, then, touching what misrepresentations were made by King, if any, and, if made, how they affected Lamborn. Mr. Lamborn testified concerning the particular specifications of misrepresentations as follows:

"Q. I wish you would state what he said relative to the production of the property for the previous 11 months, if anything.

"Witness: He reiterated the statement he had made to Mr. Richards in writing, and stated that he had produced and sold and delivered 2,300 tons and more in the city of Salmon, in addition to which he had produced, sold, and delivered 300 tons to the Copper Queen mine, some 30 or 40 miles away,

and that he had the anticipation of delivering a very much larger quantity to them, because they had shut down after using this quantity and expected to open up again.

"Mr. Richards: Q. What statement did he make relative to the workings that you were not able to investigate because of the bad air and—

"A. I called Mr. King's attention to the upper vein, and he told me that in the old workings the quality of the coal was exactly like they were delivering in town, and that it didn't need sorting. At that time they were not delivering, but he said there was some in the bins, and we examined that.

"Q. What did he say as to the face of the breast you couldn't see being that kind of coal?

"A. He said it was clean coal. He said the whole breast was 5½ feet of clean coal; he pointing out the fact that as we went into the tunnel the seams became wider and wider. He said that eventually would come out in the same way that they had in the old workings. * * *

"Q. What induced you, then, to enter into this contract?

"A. My confidence in Mr. King.

"Q. And upon that basis you made the contract?

"A. I did. * * *

"Q. Upon what percentage investment basis did Mr. King say that the property would pay, relative to the production he had stated to you?

"Witness: When I came to Salmon, I specifically asked him to show me just exactly what interest—not dividend, understand—but what interest on the bonds this would pay; and he figured out that on the 2,300 tons that it would pay $7,800 on the total production that he had had; that 6 per cent. on the amount of bonds that we would issue to ourselves on this property would require $4,800, and the balance would go to working capital, developing the property, and getting it in a position so that, if a railroad ever came through there, we could mine it much faster than the consumption of Salmon, Idaho, would take.

"Q. And you invested your money and entered into a contract on that basis?

"A. I did."

The witness further stated that he became dissatisfied with the purchase because it subsequently developed that King had not produced by a very large margin the amount of coal from the mine that he represented he had, and this constituted his principal reason for wanting to rescind.

In operating the mine under Richards' and Lamborn's charge, it soon became apparent that the output of the mine was falling largely short of what it had been represented to yield in the previous year, and yet the demand for the product in Salmon City was kept fully supplied. In reality it was found that the demand would not warrant any greater output.

Lamborn's testimony touching the alleged misrepresentations made by King is substantially corroborated by Richards, and, as to the principal, one is further substantiated by the alleged lost letter and telegram to Richards, both of which were shown Lamborn. The testimony of Richards and Miller, the latter of whom was the superintendent of the mine under King, show that King produced within the specified 11 months not to exceed 700 or 800 tons of coal, and had shipped to the Copper Queen mine less than the alleged 300 tons. King denies that he ever represented to Lamborn that the coal did not need sorting; but it is significant that, while admitting practically that he made the reputed representation respecting the quantity of the coal produced, he was unable to show with any convincing detail

the truth of his statement. King was a man of high standing for business integrity, and Lamborn relied, as we believe, upon his statements. And, while the first specification of misrepresentation may not be established with that clear and satisfactory proof as is required for rescinding, we are convinced that the latter two specifications are fully substantiated. It is enough to say that these misrepresentations were knowingly made with a view of misleading and deceiving Lamborn and inducing him to enter into the purchase in question, and that relying thereon he did make the purchase. Whether Richards purchased a one-fourth interest, or whether he was simulating a purchase only, is problematical. While in New York we are left to infer that he was representing only to Lamborn that he was buying, and left the matter to be finally arranged between King and himself. But, whether or not he finally purchased a one-fourth interest, the interest was kept distinct from the interest of Lamborn. This is established by the manner in which the payments were made, each paying and becoming obligated to the extent only of his own interest. Lamborn knew that Richards was to share with him the commissions he would be entitled to in making the sale, but in what proportion was not arranged, nor was he advised as to that until Richards wrote him upon the subject. The circumstance, however, is not material. Richards accepted bonds in lieu of his commission, which proved to be unmarketable.

The principal question of legal import is whether the relief demanded can be administered without its being first established by the appellees that they have suffered some substantial injury in a pecuniary way. We may say before proceeding to an examination of the question and kindred subjects that, while it is clear that Richards ought not to recover, that fact ought not to militate against Lamborn's obtaining relief, if otherwise entitled to it under the law. He was, so far as the facts go to show, the innocent party in the transaction, and he ought not to suffer because he was misled and overreached by a fraudulent co-purchaser in whom he placed faith and reliance. As between Richards and King, the court will leave the parties where it found them.

[1] Fraud is never presumed; and, where it is sought to recover on account of imposition through alleged fraud and deceit, the facts sustaining the charge should be clearly and satisfactorily established. This is true wherever it is sought to be shown, whether in an action at law or suit in equity. If misrepresentations are made to form the basis of relief, they must be shown to have been predicated of a material fact, and to be in truth what they are alleged to be. Furthermore, the party complaining must have relied and acted upon them either implicitly, or in the reasonable belief of the truth of what they purport to assert, and, of course, they must constitute the very ground on which the transaction took place, being proximate, immediate, and material.

[2] Nor is it always essential that the party making the representations knew them to be false. It is sufficient that he ventured the assertions without knowing whether they were true or false; "for" it is said that "the affirmation of what one did not know or believe to

be true is equally in morals and law as unjustifiable with the affirmation of what is known to be positively false." Southern Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678; Farrar v. Churchill, 135 U. S. 609, 10 Sup. Ct. 771, 34 L. Ed. 246; Smith v. Richards, 13 Pet. 26, 10 L. Ed. 42; Lehigh Zinc & Iron Co. v. Bamford, 150 U. S. 665, 14 Sup. Ct. 219, 37 L. Ed. 1215; Trenchard et al. v. Kell (C. C.) 127 Fed. 596; Simon v. Goodyear, 105 Fed. 573, 581, 44 C. C. A. 612, 52 L. R. A. 745.

[3] If the party complaining has the means of knowledge as readily at hand as the party making the false representations, upon which the former has occasion to act, it is incumbent upon him to avail himself thereof, and, if he neglects or omits so to do, he will not be entitled to favorable consideration, for he cannot shut his eyes to the things that are before him. So, if it be that such a party has investigated for himself, seeking from other quarters the verification of the statements, has not been impeded in his inquiry, and has made it as full and searching as he chose, he cannot well insist that he relied upon the verity of such statements. Farrar v. Churchill, supra; Farnsworth v. Duffner, 142 U. S. 43, 12 Sup. Ct. 164, 35 L. Ed. 931; Slaughter v. Gerson, 13 Wall. 379, 20 L. Ed. 627.

In the case at bar it is clear that the means of knowledge for obtaining information touching the quality of the product of the mine, also as it respects the quantity of coal sold the previous 11 months and the extent of the market therefor within and about Salmon City were not at hand, and that complainants were without available opportunity to investigate for themselves. Furthermore, it does not appear that Lamborn attempted any independent investigation of his own. He could not investigate the old room of the mine because it was closed to entrance at the time, and he could not know how to direct inquiry to verify King's statement as to the quantity of coal produced and the market for its sale.

[4] Now to the principal question. It is quite true that, where pecuniary recovery is sought on the grounds of misrepresentation and deceit, the measure of damages is the difference between the actual value of that which the complainant parts with and the actual value of that which he receives under his contract. The rule excludes all speculation and is limited to compensation only, and relates to the loss really sustained in a pecuniary sense. Smith v. Bolles, 132 U. S. 125, 10 Sup. Ct. 39, 33 L. Ed. 279; Sigafus v. Porter, 179 U. S. 116, 21 Sup. Ct. 34, 45 L. Ed. 113. The rule, however, does not always afford relief to one who has been misled and entrapped into purchasing something he did not bargain for. There may be an injury without pecuniary loss that is as revolting to conscience as if actual damages had ensued. So it is there is a distinction between "damnum" and "injuria." The former means only harm, hurt, loss, damage, while the latter comes from "in," against, and "jus," right, and means something done against the right of the party, producing damage, and has no reference to the fact of the amount of damage. West Virginia Transportation Co. v. Standard Oil Co., 50 W. Va. 611, 40 S. E. 591, 56 L. R. A. 804, 807, 88 Am. St. Rep. 895.

As was said by Archbald, D. J., in Mather v. Barnes, etc. (C. C.) 146 Fed. 1000, 1004:

"The general principles upon which a suit of this kind proceeds are too well settled to need the citation of authorities. A misrepresentation with regard to material facts by which a purchase of property is intentionally induced amounts to a fraud which vitiates the transaction, and entitles the purchaser to be relieved. * * * Neither does it matter if misrepresentation be proved that the bargain, even so, was a good one, from which the purchaser is likely to sustain no loss. In an action of deceit, no doubt, this would be relevant on the question of damages in order to show that there were none; * * * but not so upon a bill to rescind. Hansen v. Allen, 117 Wis. 61, 93 N. W. 805; Clapp v. Greenlee, 100 Iowa, 586, 69 N. W. 1049. The purchaser is entitled to the bargain which he supposed and was led to believe that he was getting, and is not to be put off with any other, however good. It is of no consequence in the present instance, therefore, that the plaintiffs got coal lands of intrinsic value, which are worth perchance all that was paid for them, if they were fraudulently induced to believe by representations for which the defendants are responsible that the upper Freeport vein, for which they negotiated, underlaid the whole property, whereas, in fact, it extends over but a comparatively limited part."

The principle is pointedly illustrated in Hansen v. Allen, the case cited by Judge Archbald. The plaintiff was shown one piece of land, but purchased another, believing in reliance upon the representations of the agent of the vendor that he was purchasing the one shown him. In deciding the case, Cassoday, C. J., speaking for the court, said:

"It is claimed that even if the plaintiff was induced to make the contract by such fraud, yet there is a failure on the part of the plaintiff to show that he was actually damaged by reason of such fraud. It is enough to say that the plaintiff was entitled to have the particular piece of timbered land with a stream of water upon it which had been pointed out to him, and for which he had actually contracted, instead of a different piece of land situated at some other place."

So it was directly held in MacLaren v. Cochran, 44 Minn. 255, 258, 46 N. W. 408, 409:

"If a party is induced to enter into a contract by fraudulent representations as to a fact which he deems material, and upon which he has a right to rely, he may rescind the contract upon the discovery of the fraud, and the party in the wrong should not be heard to say that no real injury can result from the fact misrepresented."

To the same purpose, see Williams v. Kerr, 152 Pa. 560, 25 Atl. 618; Potter v. Taggart, 54 Wis. 395, 11 N. W. 678; Martin v. Hill, 41 Minn. 337, 43 N. W. 337; Harlow v. La Brum, 151 N. Y. 278, 45 N. E. 859; Wainscott v. Occidental Bldg. & Loan Ass'n, 98 Cal. 253, 33 Pac 88; 14 Am. & Eng. Ency. of Law (2d Ed.) 140.

Authorities are cited, none from the federal courts, however, which are in apparent conflict with these. Among them are the following: American Bldg. & Loan Ass'n, 48 Neb. 455, 67 N. W. 500; Jakway v. Proudfit, 76 Neb. 62, 106 N. W. 1039, 109 N. W. 388; Cochran v. Pascault, 54 Md. 1; Wenstrom Consolidated Dynamo & Motor Co. v. Purnell, 75 Md. 113, 23 Atl. 134; Bom v. Rosser, 131 Ala. 215, 31 South. 430. But they do not appeal to our judgment as founded upon the better reasoning or voicing the sounder rule.

[5] The complainant Lamborn was led to believe and supposed that he was purchasing a mine that was producing about 2,600 tons

of coal per annum, and that for 2,300 tons thereof there existed a local market wherein it could be readily and continuously disposed of as produced at a rate which would yield a good profit, namely, $6 per ton and above. This it was calculated would produce returns sufficient to pay the accruing interest on the eighty thousand dollar bond issue and leave a margin of $3,000, with which to develop the mine. Now a mine that will do this having an ample market for its product is a very different thing from a mine that produces not to exceed 800 tons of coal per annum, and with a market of no greater proportion. The profits at best would yield but half enough to pay the fixed charges so arranged for by the very terms of the contract to purchase, saying nothing of any surplus for development purposes. So it is that Lamborn in good conscience did not get the thing he bargained for. And it could make no difference that the mine was in reality worth all that he agreed to pay for it, or that the land is now worth that amount for agricultural purposes. He was not buying agricultural land, but a mine capable of a certain tonnage product of coal, having a local market for the disposal of such product. This he did not get, and is therefore entitled to have the contract rescinded.

The decree of the Circuit Court will be modified, awarding the relief prayed for as to Lamborn, but dismissing the complaint as to Richards, with costs in favor of the appellee Arthur H. Lamborn and against the appellants.